CHRISTOPHER MEYER, Appellant, *v.* THOMAS S. BLAIR et al., Respondents.

Plaintiff became one of several subscribers for certain shares of the B. I. & S. Co., owned by the company, and which it offered for sale for the purpose of paying a prior lien, and to procure working capital. He was induced so to subscribe by an agreement on the part of defendants that if, at the end of a year, he desired to sell his shares, they would take the same and pay him the amount paid therefor, with interest. The subscription paper stated that subscription was not to be binding until the whole number of shares specified therein " shall have been reliably subscribed." In an action upon the agreement, *held*, that it was valid and enforceable; that it was not *per se* fraudulent as to co-subscribers or in violation of any express or implied obligation between them.

The cases of subscriptions to the stock of a corporation, accompanied by a secret agreement between the company and the subscriber that he shall not. be bound by his subscription like *W. M. R. R. Co.* v. *Eastman* (34 N. H. 124), and cases of composition between debtor and creditor, with a secret arrangement between the debtor and a creditor securing to the latter a secret advantage over other creditors like *White* v. *Kuntz* (107 N. Y. 518) distinguished.

(Argued April 27, 1888; decided June 5, 1888.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made March 26, 1886, which affirmed a judgment in favor of defendants, entered upon a decision of the court on trial without a jury.

This action was brought upon an agreement executed by the defendants, of which the following is a copy :

"NEW YORK, *April* 4, 1873.

" Whereas Christopher Meyer has purchased six hundred shares of the stock of the Blair Iron and Steel Company, sold by A. S. Diven, trustee of said company, at the price of fifty dollars per share ;

" Now we, the undersigned, in consideration of one dollar to us in hand paid, the receipt whereof is hereby acknowledged, do hereby agree that if at the end of one year from this date the said Meyer shall desire to sell the said shares at

the price paid for the same by him, we will purchase the same at that price, and pay to him the amount paid by him on the same, with interest at the rate of seven per cent per annum.

"*April* 4, 1873.

" THOMAS  S.  BLAIR.

" THOMAS  STRUTHERS."

The defendant Blair was president of the company named and Struthers was one of its trustees.

The said agreement was executed as an inducement to plaintiff to subscribe for certain stock of the company. Plaintiff thereupon signed a subscription paper attached to a prospectus, of which papers the following are copies:

" NEW YORK, *January* 20, 1873.

" The capital stock of the Blair Iron and Steel Company is 25,000 shares of $100 — $2,500,000.  This capital has been paid up by the transfer of the patents for the Blair process and the works at Glenwood, Twenty-third ward of Pittsburg, Pa., to the company (the deed for the Glenwood property to be made as soon as any empowering act can be obtained from the Pennsylvania legislature, which we have bound ourselves to procure), and the whole stock of said company issued to us in payment therefor.

" We have agreed to place in the hands of General A. S. Diven, as trustee, 9,000 shares of this stock, to be used as working capital for the company, subject to the order of the board of trustees of said company, excepting $50,000 of the proceeds thereof first to be paid to us by said trustee.

" The trustees of the company have, with our consent, ordered the sale of 6,000 of said shares for the purpose of raising a present working capital and paying said $50,000, the minimum price to be $50 per share.  And said trustees, with the approbation of the board of trustees, now offer said 6,000 shares at said minimum price of $50 per share, to be paid for as follows, viz. :  One-third part thereof as soon as the whole 6,000 shares shall be subscribed for, and the remainder in such

installments as the board of trustees may call for the same for the purposes of the business, the certificates to be delivered when the whole shall be paid.

> " THOMAS S. BLAIR.
> " T. STRUTHERS.
> " MORRISON FOSTER,
>
>> " By his Attorney,
>>> " T. STRUTHERS.

" We, the undersigned, hereby subscribe to the number of shares of the above 6,000 shares set opposite to our names, respectively, to be paid for according to the terms above set forth ; but this subscription not to be binding until the whole 6,000 shares shall have been reliably subscribed."

Plaintiff signed for 600 shares and paid thereon $10,000, which sum he sought to recover after having notified defendants that he desired them to take the stock under the agreement, and they having refused.

*William H. Williams* for appellant.   Plaintiff's subscription was valid and binding upon him. (Willard's Eq. Jur. 258.)   Proof that the consideration of one dollar was not paid does not invalidate the instrument. (*Barnum* v. *Childs*, 1 Sandf. [Sup. Ct. R.] 58; *McCurtie* v. *Stevens*, 13 Wend. 527; 1 Parsons on Con. [7th ed.] 498.)   As the agreement was made in New York, and was to be performed in New York, the plaintiff was not bound to go out of New York to make a demand or a tender. (*Allshouse* v. *Ramsey*, 6 Whart. 631 ; *Hale* v. *Patten*, 60 N. Y. 233 ; *Smith* v. *Smith*, 25 Wend. 405; Littleton, § 304; 2 Coke on Litt. [3d ed]. 55.)   After the refusal of the defendants to perform the agreement on their part, no tender of performance was necessary on the part of plaintiffs.   Even if it should be held that the agreement was of such a character that the other subscribers could allege it as a defense in an action to enforce their liability as constituting a fraud upon them, and if it could thus be regarded as a constructive fraud, still that is not available as

a defense in this action. (*Delamater* v. *Bush*, 63 Barb. 168; *Barker* v. *Hoff*, 7 Hun, 284.)

*Elial F. Hall* for respondents. Plaintiff in accepting the agreement *sued* upon took "a secret or separate advantage to the prejudice of his associates, which rendered it invalid." (*Getty* v. *Devlin*, 54 N. Y. 412; *White Mountains R. R. Co.* v. *Eastman*, 34 N. H. 124, 140; *Graff* v. *P. & S. R. R. Co.*, 7 Casey, 489; *Miller* v. *H. J. & S. R. R. Co.* 6 Norris, 95; *Chandler* v. *Brown*, 77 Ill. 333; 80 id. 446; L. R., Eq. Cas. 74; *Breck* v. *Cole*, 4 Sandf. 79; *Stewart* v. *Trustees of Hamilton College*, 2 Den. 403; *N. Y. Exchange Co.* v. *De Wolf*, 5 Bosw. 593; 31 N. Y. 273; *Blodgett* v. *Morrill*, 20 Vt. 509; *Adams* v. *Outhouse*, 45 N. Y. 318; *Solinger* v. *Earle*, 82 id. 393; *Holmes* v. *Johnson*, Cowp. R. 343; *Van Horne* v. *Fonda*, 5 Johns. Ch. 388.) It is the mere fact of such agreement having been made that constitutes the fraud. (2 Chitty on Cont. [11th Am. ed.] 1051.)

ANDREWS, J. The defense set up by the defendants to escape from the plain obligation assumed by them under the agreement of April 4, 1873, is founded upon no equity in their favor, and if allowed to prevail, will defeat a contract which, on its face, was perfectly legal and valid. Nor is it claimed that the contract is void for fraud, mistake or want of consideration as between the parties. The defendants fully understood the contract into which they entered; they, in fact, tendered it to the plaintiff as an inducement to him to become a subscriber to the stock of the Blair Iron and Steel Company, and as between the parties, and considering their relations only, there can be no doubt that the plaintiff is entitled to enforce it. But the defendants assert that, by reason of extrinsic facts, the contract was tainted with illegality, and they invoke for their defense the settled principle of public policy frequently acted upon and applied, that "no court will lend its aid to a man who founds his cause of action upon a fraudulent or illegal act." (Lord MANSFIELD in *Holman* v. *Johnson*, Cowp. R. 341, 343.)

The contract in form is a contract by the defendants to buy from the plaintiff, within one year from the date of the contract, certain shares of stock purchased by him of the Blair Iron and Steel Company, in case the plaintiff shall desire to sell the same, and to pay therefor the price paid by the plaintiff on his purchase of the same stock from the company. The supposed vice of the contract resides in the fact that the plaintiff, at the request of the defendants, the principal promoters of the company and the owners of most of the shares, concurrently with the making of the contract in question became one of several subscribers for 6,000 shares of the Blair Iron and Steel Company, owned by the company. and which it offered for sale under the terms of a prospectus and subscription which are set forth at large in the case. In substance, the claim is that the agreement of the plaintiff with the defendant operated as a fraud on the other subscribers to the stock, because his capital was not put at risk during the year in which he could exercise the option given by the contract; and that this was a secret advantage the securing of which was inconsistent with good faith on the part of the plaintiff towards the other subscribers. The prospectus which accompanied the subscription set forth, in substance, that 9,000 shares of the stock had been placed by the defendants and one Foster in the hands of a trustee for the company, the proceeds of which, except $50,000, were to be "used as working capital," and that the trustees had ordered the sale of 6,000 shares for that purpose and to pay the prior lien of $50,000, at the minimum price of $50 per share, payable one-third as soon as the whole was subscribed for, and the balance as called for by the trustees, the certificates to be delivered when the whole subscription should be paid. The subscription, which was appended to the prospectus, was as follows: "We, the undersigned, hereby subscribe to the number of shares of the above 6,000 shares set opposite to our names, respectively, to be paid for according to the terms above set forth; but this subscription not to be binding until the whole 6,000 shares shall have been reliably subscribed." Sixteen or more persons

and firms severally subscribed for shares aggregating the whole number, or 6,000 shares, of whom the plaintiff was the sixth subscriber, he subscribing for 600 shares. We are unable to concur in the conclusion reached in the courts below, that the contract in question was fradulent as to co-subscribers with the plaintiff for the 6,000 shares sold by the company, or that it was in violation of any express or implied obligation existing between them.

The cases mainly relied upon to support the claim that the contract was illegal and fraudulent are of two classes—cases of stock subscriptions to the stock of corporations, accompanied by a secret agreement between the company and the subscriber that the latter should not be bound by his subscription, or changing, in some other respect, its ostensible terms, and cases of composition between a debtor and his creditors, where a creditor joining in the composition by a secret arrangement with the debtor secures an advantage over other creditors in violation of the understanding implied in all cases of composition that the settlement with the creditors joining in the composition proceeds exclusively upon the terms of the common agreement. In both classes of cases mentioned the collateral agreement is held to be void. In the first, the courts hold the subscriber to the ostensible contract, and permit it to be enforced in an action by the company as the only means of preventing the consummation of the fraudulent scheme and protecting the other subscribers. ( *White Mountains R. R. Co.* v. *Eastman*, 34 N. H. 124.) In the other class the court refuses to enforce the secret bargain, and confines the creditor, who is a party to the fraud, to a remedy to recover the sum which, by the terms of the composition, he agreed to accept. ( *White* v. *Kuntz*, 107 N. Y. 518.) The case of *White Mountains Railroad Company* v. *Eastman* (*supra*) is a leading case, illustrating the class of cases first mentioned. The doctrine that an agreement between one subscriber to the stock of a corporation and the company, made concurrently with the making of the subscription, which purports to annul its obligation, or materially limit and change the liability of the subscriber, to the detri-

ment of the company is invalid and void, is founded upon the construction that a subscription to the stock of a corporation, whose stock is open for general subscription, is not only an undertaking between each subscriber and the company, but between him and all other subscribers to the common enterprise; and that each subscriber has the right to suppose that the subscription of every other subscriber is a *bona fide* undertaking according to its terms. "Their respective subscriptions," says the court, in the case of *White Mountains Railroad Company* v. *Eastman,* "are contributions or advances for a common object. The action of each in his subscription may be supposed to be influenced by that of the others, and every subscription to be based on the ground that the others are what, upon their face, they purport to be." (See, also, *Graff* v. *Pittsburgh & Steubenville R. R. Co.,* 7 Casey [31 Penn. St.], 489; *Miller* v. *Hanover Junction & Susq. R. R. Co.,* 6 Norris [87 Penn. St.], 95; *Melvin* v. *Lamar Ins. Co.,* 80 Ill. 446.) The illegality of secret agreements in case of composition between debtor and creditor has been established by a uniform course of decision upon the plainest principles of morality and justice. A composition agreement, still more than a stock subscription, is an agreement as well between the creditors themselves as between the debtor and his creditors. Secret agreements in fraud of the composition are usually extorted by the creditor as a consideration of his entering into the composition. They are a direct fraud upon the other creditors. They contradict the representation which the composition imports — that the compromise is accepted by each creditor in full satisfaction of his debt. Moreover, where the composition provides for giving credit to the debtor for the amount to be paid on the composition, such secret agreements take, or may take, from him the very means to meet the composition engagements. It is unnecessary to cite authorities to sustain a doctrine so well settled. We refer to some cases showing that the courts, in these transactions, exact the most scrupulous good faith from all parties. (*Russell* v. *Rogers,* 10 Wend.

474; *Solinger* v. *Earle,* 82 N. Y. 393; *Knight* v. *Hunt,* 5 Bing. 432; *Leicester* v. *Rose,* 4 East, 372.)

The present case is not, we think, within the principle of the stock subscription cases or the cases of composition to which reference has been made. The main object of the company in offering the stock for sale was to secure " working capital," as is shown by the prospectus. This object was known to the subscribers. If the subscription of the plaintiff was a pretense merely, or if the subscription had been accompanied by a secret agreement between the plaintiff and the company that he should be relieved from the subscription, or by which the terms of the purchase were materially changed to the disadvantage of the company, and for the advantage of the plaintiff, there might be ground for applying the rule declared in the subscription cases, and declaring the transaction to be a fraud on the other subscribers. By the terms of the subscription the subscribers were not to be bound unless the whole 6,000 shares were " reliably subscribed," and a subscription not available to the company, by reason of a secret agreement accompanying it, would not be a reliable subscription within the meaning of the condition. But there was no agreement between the company and the plaintiff, secret or otherwise, direct or indirect, except the agreement contained on the face of his subscription. The plaintiff by his subscription became bound to the company to take the shares subscribed for, and this agreement has never been discharged or in any way impaired. The plaintiff remained bound by his subscription, notwithstanding the agreement with the defendants, as fully and completely as though the agreement with the defendants had never been made. Nothing has occurred to change, qualify, or limit his obligation to the company. The company sold the shares to secure " working capital." The subscription of the defendant, entered with the other subscriptions, secured the accomplishment of the object. The condition of the subscriptions, that the whole 6,000 shares should be " reliably subscribed," was fulfilled. It was so conceded on the trial. The defendants were interested in setting the company

afoot. They were the principal holders of its stock. Presumably they had confidence in the value of the new process for manufacturing iron and steel, covered by their invention. They sought out the plaintiff. On his declining at first to subscribe to the stock of the company, they offered him the inducement that they would take the stock off his hands within a year, at cost price, if he desired it. It appears that the same inducement was offered to other subscribers, but not to all. We think there was nothing illegal in this arrangement. There was no community of action between the subscribers. Each subscribed for such reasons as satisfied him. It is supposable that some subscribers may have been influenced by the fact that other persons, known to them, in whose business judgment they had confidence, had also subscribed. But we think it would too greatly interfere with the freedom of contract to hold that, for this reason, a subscriber could not enter into an agreement with third persons at the time of the subscription, to the effect that the latter should assume the risk of the enterprise, there being no actual fraud, and the relations between the subscriber and the company remaining unchanged. The contract in the case of *Adams* v. *Outhouse* (45 N. Y. 318), was, in its very nature, fraudulent and dishonest. It was the price of a fraudulent concealment by one of several distributees of an estate of assets in which all the distributees were equally interested.

We think the judgment is erroneous, and it should therefore, be reversed.

All concur.

Judgment reversed.