ALBERT SARBACH *et al.* v. THE KANSAS FISCAL AGENCY COMPANY *et al.* (T. A. MCNEAL, *Intervenor, Appellant;* T. A. POLLOCK, *as Receiver, etc., Appellee*).

No. 17,489.

SYLLABUS BY THE COURT.

1. CORPORATION—*Stockholder—Conditional Subscription.* A corporation organized ostensibly to sell insurance as agent for another company proceeded to sell stock in its own concern. It sold one hundred shares to M., taking his note due in six months and giving a written agreement that "his note given in payment for stock" should not be discounted before maturity, and that if at any time, for any reason, M. should desire to surrender the stock certificate he might do so and receive his note back together with any profit that might accrue in replacing such stock, also any money he might have paid on the note. He· receipted for the stock "purchased by me," also receipted for a dividend "on Certificate No. 330, for 100 shares of the capital stock of the Company, owned by me August 15, 1907." *Held,* that M. thereby became a stockholder and not a mere optional subscriber.

2. STOCK—*Subscription — Promissory Note — Collateral Agreement.* The company sold its stock to many persons, though it had no substantial value, and being insolvent the company, upon the petition of certain shareholders, was put in charge of a receiver who succeeded in collecting a small sum netting about $1400, constituting the entire discoverable assets of the concern. The note was promptly negotiated and M. was compelled to pay it, the company·refusing to take back his stock or repay the amount of the note. M. intervened in the receivership suit, setting up his contract with the company and its breach and praying for an order allowing him the amount of

the note out of the assets in the hands of the receiver or his just proportion thereof with other allowed claims against the company. *Held,* that as between M. and the other stockholders his contract with the company was one which equity will not enforce at their expense.

Appeal from Wyandotte court of common pleas. Opinion filed March 9, 1912. Affirmed.

*Ross B. Gilluly,* for the appellant.

*Clad Hamilton,* and *Clay Hamilton,* for the appellee.

The opinion of the court was delivered by

WEST, J.: The Interstate Fiscal Agency Company was organized to sell insurance and proceeded to sell stock in its own company. In March, 1907, a dividend of 18 per cent was paid and in September following a dividend of 22 per cent. On the 5th of April the intervenor subscribed for one hundred shares, signing the following receipt, April 9:

"I hereby acknowledge receipt of Certificate No. 330 for 100 shares of the capital stock of the Interstate Fiscal Agency Company purchased by me on the 5th day of April, 1907, and herewith authorize the Secretary or President of the Company to receipt the stock book for said certificate."

On September 2, 1907, the intervenor receipted for $156.50 being a 22 per cent semiannual dividend "on Certificate No. 330, for 100 shares of the capital stock of said Company owned by me Aug. 15, 1907." When the stock was subscribed for in April the following paper was given the intervenor by the agent of the company:

"It is agreed hereby between The Interstate Fiscal Agency Company and T. A. McNeal that his note given in payment for stock shall not be discounted before maturity thereof and that if at any time said T. A. McNeal for any reason desires to surrender stock certificate he may do so and receive his note back, together with any profit that might accrue in the re-

placing for said stock, also any money he may have paid on said note."

The charter authorized the company to deal in its own stock. Before its maturity the note was negotiated and the intervenor was compelled to pay it. The company, on petition of certain stockholders, was placed in the hands of a receiver, being insolvent and the venture having been substantially a failure. The petition alleged, among other things, fraudulent misrepresentations on the part of the officers and that none of the money paid for stock went into the treasury but that it was appropriated by the president and his associates to their own use except a small portion used to pay dividends. The prayer was that an account be taken, that the affairs be wound up, that a receiver be appointed, and for general relief. A receiver was appointed and now has in his hands about $1400. The intervenor filed his petition setting up that his purchase of the stock was conditional and that his note was to be surrendered if he concluded before its maturity not to take the stock, and that the company, through its agent, treated the sale as an absolute one and negotiated the note, that before its maturity the company became insolvent and practically without assets, and the capital stock entirely worthless, "or rather, it became apparent that said stock never in truth and fact had any value at any time," and that when he demanded his money back his demand was refused to his injury $1500, praying for a judgment in his favor and the allowance of the sum of $1500 as a just claim and that the same be paid out of the funds in the possession of the receiver to the intervenor or his just proportion thereof with other allowed claims, with interest. The trial court decided against the intervenor and he appeals.

The question presented is whether the collateral agreement to take back the stock and not to negotiate the note before maturity is such a valid one as en-

titles the intervenor to the relief prayed for.  The receiver insists that the transaction shows a *bona fide* subscription for the stock, that the receipt therefor and the subsequent receipt for the dividend thereon are proof that the stock was issued and operated as a recommendation to other subscribers or victims, and that the collateral agreement was void and that the intervenor as against the other stockholders of the insolvent and defunct corporation is not in equity entitled to the preference sought.

It is urged by the intervenor that the transaction was legal and that he is entitled to receive his money back from the company which negotiated his note in violation of its collateral agreement.  It is argued that he did not become a stockholder but only gave a conditional subscription for stock amounting to an option. We are unable to take this view of the matter.  The receipt itself indicates a purchase of stock, the receipt for the dividend expressly states that it is for stock owned by the intervenor, and the collateral agreement states that his note "given in payment for stock" shall not be discounted before maturity and that if at any time the intervenor for any reason "desires to surrender stock certificate he may do so."  The most that can be said about the transaction is that it was a purchase of stock and the payment therefor accompanied by a collateral agreement to repurchase in case the subscriber should desire the company to do so.  But until such desire was manifested there can be no question that he was in fact a stockholder to all intents and purposes.

*Ophir Consol. Mines Co. v. Brynteson,* 143 Fed. 829, was a case in which the company gave the subscriber a writing stating that he had paid $15,000 for 50,000 shares of its stock issued to him and binding itself to return the money with interest eighteen months after date if he was not satisfied with the investment.  The subscriber sued for the return of his money and the writing was held to be a "sale or return contract"

47—86 KAN.

(syl. ¶ 2) and valid as between the subscriber and the company. But the rule is well settled that a subscription upon condition subsequent ordinarily renders the subscriber liable as a stockholder and the company liable on the collateral agreement, and this is the only rule which could give effect to the plain language used in this case.

"A subscription on a condition subsequent contains a contract between the corporation and the subscriber, whereby the corporation agrees to do some act, thereby combining two contracts, one the contract of subscription, the other an ordinary contract of the corporation to perform certain specified acts. The subscription is valid and enforceable whether the conditions are performed or not. The condition subsequent is the same as a separate collateral contract between the corporation and the subscriber for breach of which an action for damages is the remedy." (Cook on the Law of Stocks and Stockholders, § 78.)

Thompson in his work on corporations calls such a transaction a "subscription upon special terms" (1 Thomp. on Corp., 2d ed., § 625) and says:

"On the other hand, a subscription on special terms is an absolute subscription which makes the subscriber a stockholder and renders him liable as such from the time when his subscription is accepted, whether the conditions are performed or not. The special terms attached to a subscription are regarded as independent stipulations, the remedy for the breach of which is an action against the corporation for damages." (1 Thomp. on Corp., 2d ed., § 626.)

The rule thus stated applies when the condition is contained in the contract of subscription. Here it was embodied in a contract separate from the subscription and separate from the receipt for the stock. It is, therefore, the case of a stockholder claiming to be damaged by the company's failure to purchase back the stock owned by him, or, to put it in another way, by its failure to purchase such stock and repay him therefor after having negotiated his note which he was com-

pelled to pay. Probably as between the intervenor and the company the latter was bound and the former was damaged, and had the company been solvent and possessed assets out of which its ordinary claims could be paid he might be entitled to a judgment, but as against other stockholders who were also defrauded by the company and induced to part with their money for worthless stock the question arises whether he is entitled to have his claim paid. The case of *Porter v. Plymouth Gold Min. Co.*, 29 Mont. 347, 74 Pac. 938, cited by counsel, holds that an agreement by a corporation to purchase its own stock from a stockholder may be lawfully made "if the corporation is not insolvent or in process of dissolution." (Syl. ¶ 4.) It would seem true, as a matter of principle, that a solvent corporation acting through its officers who are authorized by the stockholders or by its charter might, as between itself and a subscriber, contract to purchase back his stock. But this does not mean that it could do so regardless of the rights of creditors, or that an insolvent corporation, acting through its officers without direction or knowledge of the stockholders, could do so at their expense and over their protest. The reason and justice of the thing as well as the overwhelming weight of authority is that subscribers to the shares of a corporation should stand on an equal footing. Every one knows that subscriptions are often induced by knowledge that other investors have subscribed, and it is the usual and customary thing to make use of this fact to secure investments by others who are solicited. If such subscriber, without the knowledge of the others, enters into a contract with the company by which he is allowed to remain in if the venture is successful, and retire without loss if it proves a failure, the most primary promptings of justice and fair dealing dictate that he should not claim this advantage against the other shareholders when such claim amounts to his gain as measured by their loss. What was launched and floated as a

fraudulent and criminal attempt on the part of its promoters has resulted in a crash, leaving a small sum to be distributed on dissolution among the shareholders whose money enabled the fraudulent promoters and managers to effectuate the swindle. It is beyond dispute that the stock never had substantial value, the intervenor himself alleging that it never had any value at any time, and hence it follows that the investment of each subscriber was a practical loss. No claim is made that the other stockholders consented to or authorized an agreement by which the intervenor was to be relieved from his loss at their expense. Were he an ordinary creditor whose money had gone to enhance the value of the corporate shares there might be reason why he should prevail, but the very agreement by which he became a creditor was unconscionable as between himself and the other unwilling and unconsenting shareholders and therefore one which equity will not enforce.

Thompson says:

"Any secret arrangement between the agents of the corporation and a subscriber for shares to the effect that his subscription shall be merely colorable, or dischargeable on part payment, or whereby the burden which the latter (subscriber) assumed is rendered less onerous than what it purports to be, is void as a fraud upon creditors and other subscribers, and such a subscriber will be held to the responsibilities of a *bona fide* shareholder." (Thompson's Liability of Stockholders, § 124.)

(See, also, 26 A. & E. Encycl. of L. 914.)

"A secret agreement of the corporation with certain subscribers to stock, whereby they are to be released from payment, or to have some other advantage not common to all the subscribers, is no defense to a subscriber who was not promised the same advantages. All such secret agreements are void, and the subscribers receiving them are liable on their subscription absolutely, as though no special advantages had been promised." (Cook on the Law of Stock and Stockholders, § 191.)

The case of *White Mts. Railroad v. Eastman,* 34 N. H. 124, held that such an agreement, though the subscription was held out as *bona fide* to induce other subscriptions, was enforceable against the company, though void as a fraud upon the other subscribers. In the opinion it was said:

"But while the two writings are thus considered as parts of the same agreement, when they are of a character to affect only the parties to it, they may be regarded as separate and independent contracts whenever it is necessary so to regard them in order to protect innocent third persons, having an interest in the subject matter of the agreement, from the consequences of a fraud attempted to be practiced upon them by means of it. . . . That the proceeding is a fraud upon third persons is clear from the relation in which subscribers for stock in a corporation of this kind stand toward each other. In the subscription of each person every other subscriber has a direct interest, their respective subscriptions are contributions or advancements for a common object. The action of each in his subscription may be supposed to be influenced by that of the others, and every subscription to be based upon the ground that the others are what upon their face they purport to be." (pp. 140, 141.)

While this was said in a case in which such subscriptions were actually held out as inducements to other subscribers, the principle stated applies here, for, although it is not affirmatively shown that the officers of the corporation used the intervenor's name and subscription, high standing and wide acquaintance as bait for others, the indications are strong that they left nothing undone to feather their nests, and it is clear that the means for such inducements were by the contract involved placed in the hands of these unscrupulous adventurers whose manipulations closed with pleas of guilty and *nolo contendere* in federal court.

In *Meyer v. Blair et al.,* 109 N. Y. 600, 17 N. E. 228, the facts were distinguished from those in the Eastman case, but it was said:

"The doctrine that an agreement between one sub-

scriber to the stock of a corporation and the company, made concurrently with the making of the subscription, which purports to annul its obligation, or materially limit and change the liability of the subscriber, to the detriment of the company is invalid and void, is founded upon the construction that a subscription to the stock of a corporation, whose stock is open for general subscription, is not only an undertaking between each subscriber and the company, but between him and all other subscribers to the common enterprise; and that each subscriber has the right to suppose that the subscription of every other subscriber is a *bona fide* undertaking according to its terms." (p. 605.)

Following and approving these two decisions is the case of *Yonkers Gazette Co. v. Jones,* 30 N. Y. Supr. Ct., App. Div., 316, holding an agreement somewhat similar absolutely void. In *G. & S. W. R. R. Co. v. Ennor,* 116 Ill. 55, 4 N. E. 762, the first paragraph of the syllabus is as follows:

"A secret agreement made with a subscriber to the stock of a railway corporation, who subscribes with others, that he shall pay only a part of his subscription, is fraudulent as to the other subscribers, and void, and his subscription will be valid and binding for the whole amount thereof."

*Porter v. Plymouth Gold Min. Co.,* 29 Mont. 347, 74 Pac. 938, already referred to, holds that a contract to repurchase stock in case the subscriber should become dissatisfied therewith may be enforced "if it is free from fraud, actual or constructive, if the corporation is not insolvent or in process of dissolution, and if the rights of its creditors are in no way affected thereby." (Syl. ¶ 4.) The contract was very similar to the one here. The court held that the transaction made the plaintiff, not a subscriber merely, but a *bona fide* owner of stock. In *Boley v. Development Co.,* 126 Mo. App. 116, 103 S. W. 975, a contract to repurchase was held void. It was alleged that the transaction was to be regarded as a loan at the option of the sub-

Sarbach v. Fiscal Agency Co.

scriber. The real agreement was to buy the stock back at the plaintiff's election.

"It is not alone creditors who may complain, as intimated by the plaintiff, but it is equally a fraud upon other stockholders, and can not be done without their consent." (p. 118.)

This decision cites and follows *Gill v. Balis*, 72 Mo. 424, 435, and *Chrisman-Sawyer Banking Co. v. Independence Mfg. Co.*, 168 Mo. 634, 645, 68 S. W. 1026, in which a similar doctrine was announced.

In *McIntyre v. E. Bement's Sons*, 146 Mich. 74, 109 N. W. 45, it was held that a promise to repurchase can not be enforced after the corporation is insolvent. The decision rests largely on certain provisions of the Michigan statute, but in discussing the case on general principles it was said:

"The promise of such a corporation to buy its own stock, if under any circumstances valid, must be considered as made and accepted with the understanding that the shareholder may not, in face of insolvency of the company, change his relation from that of shareholder to that of creditor, escaping the responsibilities of the one and receiving the benefits of the other. To this rule there appears to be no exception." (p. 78.)

It is to be regretted that the scheme made use of by the defendant company succeeded to the extent that it did, to the damage of the intervenor and others who relied upon the honesty of its promoters, but the rules of law and the principles of equity preclude our affording the relief sought.

The judgment is affirmed.