## CARTON v. WEST VIRGINIA BRIDGE & CONST. CO. et al.

### (Circuit Court, N. D. West Virginia.  December 28, 1910.)

1. CORPORATIONS (§ 586*) — CONSOLIDATION OF BUSINESS CORPORATIONS — RIGHTS OF CREDITORS.

   A New Jersey and a West Virginia corporation engaged in the same business planned to consolidate. The name of the New Jersey corporation was changed and its capital increased, and an attempt was made to consolidate by an exchange of stock, but the proceedings taken while securing a union of interest and operation on the part of the two corporations did not effect a consolidation as provided by the New Jersey corporation act. They were both operated thereafter, however, as one company, while their business was kept entirely separate, and, the new corporation company becoming insolvent and the business so conducted being unsatisfactory, agreements were entered into for their separation by a re-exchange of stock, and, after attempts made to carry this out, the New Jersey company became a bankrupt. *Held*, that such separation agreement, while enforceable as between the companies themselves, could not be enforced so as to injure the creditors of the united company existing at the time the debts were contracted.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2348, 2349; Dec. Dig. § 586.*]

2. CORPORATIONS (§ 586*) — CONSOLIDATION — SEPARATION — ISSUANCE OF BONDS.

   The West Virginia company, after obtaining a return of its stock given in exchange for the stock of the consolidated company, could not convert a large portion thereof into bonds to be issued to the stockholders, secured by a mortgage on all the property of the corporation, either to the detriment of its own creditors or those of the united company, who became such while the two companies were joined.

   [Ed. Note.—For other cases, see Corporations, Dec. Dig. § 586.*]

3. CORPORATIONS (§ 586*) — CONSOLIDATION — INVALID PROCEEDINGS — EFFECT.

   Where two corporations attempted but failed to effect a legal consolidation, and thereafter conducted their business together, though maintaining separate organizations, they should be regarded as to such business as partners.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2348, 2349; Dec. Dig. § 586.*]

In Equity.  Bill by James D. Carton, trustee in bankruptcy of the New Jersey-West Virginia Bridge Company, a corporation, against the West Virginia Bridge & Construction Company and others.  Decree for complainant.

Prior to the year 1905 a corporation existed under the laws of New Jersey, known as the New Jersey Bridge Company, engaged in the business of erecting bridges and similar structures and having its plant at Manasquan, N. J. At the same time the defendant The West Virginia Bridge & Construction Company was existing as a corporation under the laws of West Virginia, engaged in the same business, and having its plant near Wheeling, W. Va.  At this time both companies were regarded as solvent and doing a profitable

business. In this year a scheme to unite the two companies was consummated, whereby the New Jersey company changed its name to the New Jersey-West Virginia Bridge Company, increased its capital stock from $200,000 to $500,000, of which $150,000 was to be issued to the holders of the stock of the New Jersey Bridge Company in exchange for the like amount of stock of that company outstanding. One hundred forty-five thousand five hundred dollars was to be issued to the stockholders of the West Virginia Bridge & Construction Company in exchange for the total issue of $160,700 of stock outstanding of this latter company, except 22 shares, the holders of which it seems could not at the time be ascertained. The remainder of the $500,000 of stock was to remain in the treasury of the New Jersey-West Virginia company to secure a working capital. By this plan, which was approved and consummated by the stockholders of both companies, the entire issue of stock of the West Virginia company passed to and became vested in the New Jersey-West Virginia company, except 22 shares, and the stockholders of the West Virginia company became stockholders of the New Jersey-West Virginia company to the extent of $145,500 par value. It is further shown that a majority of the directors of the New Jersey-West Virginia company was thereafter composed of persons formerly holding the stock of the West Virginia company. Both companies maintained their corporate existence, and one F. M. Peet became president of both.

It is to be noted that, while this secured a union of interest and operation on the part of the two companies, it did not effect a consolidation as provided for by the New Jersey corporation act. Under this arrangement, however, the New Jersey-West Virginia company became the operating one, and in this operation Peet became the controlling factor. Large and expensive contracts were undertaken, beyond the capacity of the plants to economically perform, and at prices necessarily involving large losses. As stated, all these contracts were taken in the name of the New Jersey-West Virginia company, although it appears that the undertakings of each company were entered separately on the books, but of this there is no evidence that creditors had notice. The inevitable result was that about April, 1907, the affairs of these two companies, thus linked together, became involved and all parties became dissatisfied.

Peet at the time acting as president of both companies claimed the New Jersey-West Virginia company owed him $240,000 and the West Virginia company $42,000 for cash advances made by him in the prosecution of the joint business. Stockholders of the West Virginia company charged that Peet's management had been improvident, and that concealment and misrepresentations of the true value of the assets of the old New Jersey company had been made, whereby they had been misled into the combination. Peet threatened to close out existing contracts and shut both plants down. On the other hand, Paxton, a former stockholder of the West Virginia company, who had exchanged his stock for that of the New Jersey-West Virginia one, demanded of Peet that he buy his stock under pain of having a receiver appointed for the New Jersey-West Virginia company. Under these conditions, after various interviews and negotiations, a new scheme developed to sever the connection of the two companies, whereby Peet should take over all the "quick" assets of the West Virginia company, pay its debts, including the amount due himself, and, when this was done, the stock of the West Virginia company held by the New Jersey-West Virginia company should be returned to the original stockholders of the former company, who, in return, should surrender the stock taken in exchange therefor in the New Jersey-West Virginia company to the latter company for cancellation.

The scheme further involved the transfer by these stockholders of the West Virginia company when they should secure their original stock back by exchange to one Wyant (who was a stockholder and one intimately associated with Peet in the management of the New Jersey-West Virginia company) for $50,000, for which it seems he was not to become personally liable, but to secure payment of which a mortgage was to be executed upon the plant and property of the West Virginia company to secure $50,000 of bonds, which bonds were to be prorated and taken by these stockholders in full payment for their stock which was to become the absolute property of Wyant.

All this resulted in a written agreement between W. A. Wilson, acting for himself and as trustee for his co-stockholders, seeking to secure the exchange of the stock held by them in the New Jersey-West Virginia company for that of the West Virginia company formerly held by them, and Peet and Wyant, under date of April 25, 1907, and a supplemental agreement, under date of May 7, 1907, between Wilson and Wyant. Substantially by these agreements Peet was to take the "quick" assets of the West Virginia company at once, collect the same, and pay this company's debts within 90 days, during which time the stocks to be exchanged were to be deposited in escrow with the First National Bank of Manasquan, N. J. At this time the debts outstanding against the New Jersey-West Virginia company aggregated near $400,000, and those against the West Virginia company $112,000. None of these debts were, however, secured by lien upon the properties of the companies. Peet, it seems, took over the "quick" assets of the West Virginia company, which at the time were estimated to be sufficient to pay its debts, and collected a considerable portion thereof, and paid some of the debts, but not all. He claimed these assets were not delivered to him until something like 60 days after the agreements were made instead of at once, and that difficulties were encountered in their collection which rendered it impossible for him to comply within the 90-day limitation provided by the contracts. In the meantime agreements of re-exchange had been approved by the stockholders of the two companies, and the stocks had been deposited with the Manasquan bank in escrow, and Wilson and those associated with him were demanding the prompt exchange and the execution by Peet, as president, of the mortgage upon the property of the West Virginia company, whereby their $160,700 of stock should, in effect, be converted into $50,000 of mortgage bonds. Peet delayed and finally refused to execute this mortgage, claiming both sides had failed to comply with the terms of the contract. The total insolvency of the New Jersey-West Virginia company became apparent, the First National Bank of Manasquan, largely by reason of its having carried this company, failed, and in May, 1908, this New Jersey-West Virginia Bridge Company was in the District Court of the United States for New Jersey adjudged bankrupt, and the plaintiff Carton, in August following, was appointed and qualified as its trustee. On June 10, 1908, a special meeting of the original stockholders of the West Virginia Bridge company, claiming to be such stockholders by reason of the re-exchange provided for by the agreements of April and May, 1907, was held, a resolution was adopted authorizing and directing the issue of $50,000 of bonds and deed of trust to secure the same, to be executed by W. A. Wilson, its vice president. These bonds were to run 10 years, with interest at 6 per cent. payable semiannually, and failure of payment of such interest should constitute a default authorizing sale of the property by the trustee. This deed of trust was executed as of June 11, 1908, to the Dollar Savings & Trust Company as trustee. Default was made in payment of interest, and a sale of the property of this West Virginia company by the trustee was advertised.

Thereupon the plaintiff Carton, trustee in bankruptcy for the New Jersey-West Virginia company, with the assent of the District Court of New Jersey, filed in this court his bill, setting forth substantially the facts as above, but much more in detail, and prays that the re-exchange of stocks contemplated by the two agreements of April 25 and May 7, 1907, be declared fraudulent and void as to the creditors of the New Jersey-West Virginia company, and that title and ownership in and of the $160,700 of stock of the West Virginia company, so sought to be re-exchanged, be vested in him as trustee for the bankrupt, the New Jersey-West Virginia company; that the authorization and execution of the $50,000 bonds and of the deed of trust to the Dollar Savings & Trust Company, trustee, to secure the same, by the West Virginia company, be declared to have been made without authority by those who were not in fact stockholders, and be wholly set aside and annulled as being without consideration, fraudulent, and void; that the sale under this deed of trust be enjoined, a receiver be appointed, the interest of the New Jersey-West Virginia company in and to the property of the West Virginia company be ascertained, the property be sold, and such interest be paid over to plaintiff as trustee aforesaid. Answers to this bill have been made by W. A.

Wilson and by F. C. Wincher and other original stockholders of the West Virginia company jointly, replications thereto have been entered, voluminous testimony has been taken, and receivers appointed to care for the property of the West Virginia company. In addition to this, the Citizens' Trust & Guaranty Company of West Virginia, a West Virginia corporation, has filed its petition, alleging itself to be a judgment creditor of the West Virginia company to the extent of $10,500, with interest from May 17, 1909, until paid, and $598.75 costs, rendered by the circuit court of Ohio county, W. Va.; that it has sued out execution upon said judgment, and levied the same upon certain specified property of the West Virginia company, and acquired an execution lien thereon; that the basis of this judgment was a debt incurred long prior to the mortgage and agreements to re-exchange stocks; that it was for compensation for the performance of certain construction work done by petitioner solely for the West Virginia company, with which the New Jersey-West Virginia company had no concern. To this petition Carton, trustee, has filed answer, in substance a general denial of its allegations.

Edmund Wilson, Warren H. Smock, Durand, Ivins & Carton, T. S. Riley, and J. B. Handlan, for plaintiff.

Russell & Russell, for defendants.

Nelson C. Hubbard, for petitioner Citizens' Trust & Guaranty Co.

DAYTON, District Judge (after stating the facts as above). Long and earnest study of this record and of the comprehensive and able briefs submitted by counsel upon both sides has compelled me to the conclusions: First. That the agreements of April 25 and May 7, 1908, seeking to effectuate a re-exchange of the stocks, so that the West Virginia company might be freed from its union with the New Jersey-West Virginia one and have its property restored to its original stockholders, while enforceable as between the companies themselves, cannot be so enforced to the injury and loss of creditors of the New Jersey-West Virginia company, existing at the time these contracts were executed. Second. That the original stockholders of the West Virginia company, claiming to have gotten back their stock under such agreements, were not justified or authorized to convert such $160,700 of stock into $50,000 of bonds to be issued to themselves and secured by mortgage upon all the property of the company, either to the detriment of the company's own creditors, or those of the New Jersey-West Virginia company, incurred while the two companies were joined together. It is true that the union of these companies was not such as to effect a legal consolidation, and that the separate organizations were maintained and the work undertaken, and the obligations, receipts, and disbursements of these companies were kept separate and apart upon their respective books, and it is for these reasons that I am of opinion that free from debt and as between themselves there existed no legal reason why they could not dissolve the union as contemplated by the agreements of April and May, 1907. On the other hand, it seems to me clear that creditors had no knowledge of the methods resorted to and of the internal management of these companies; that the New Jersey-West Virginia one was held out to the world as the owner of the properties of both; that it was in fact, so far as creditors could know, a consolidation of the two old companies, the operating, purchasing, and contracting one for both plants; and that under such circumstances they had right to extend credit to this New Jersey-West

Virginia company with the full expectation that the property of both companies would be held bound for the payment of debts.

It is well settled that both stockholders and officers of corporations are in a sense trustees of the corporate effects, and must fulfill these quasi fiduciary obligations to creditors before they can look to their individual interests as such stockholders and officers. To permit, in the first place, the stockholders of these two companies to effect what was to all appearances a legal consolidation through the increase of stock of one with which the stock of the other was purchased, the same man to become president and the controlling force, large and disastrous contracts to be taken, whereby the operating company is rendered insolvent and then allow the apparently absorbed company to resume its identity, take back its stock, pay only such debts as it saw fit to assume, and leave the other company bankrupt, would not, in my judgment, meet the obligation required by law of corporate stockholders. And, in the second place, to allow the stockholders of any corporation, so long as it has debts outstanding, to convert their stockholdings into bonds secured by mortgage upon the property of the company, whereby its creditors would be excluded from payment of their debts, or hindered or delayed in their collection, cannot be justified by any principle of equity.

While this union of these companies was not a legal consolidation, it was in effect like a partnership between individuals, and much the same rules should govern in the application of equity principles in adjusting here the rights of parties, especially those of creditors. The bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]) provides that in cases of partnerships, where bankruptcy ensues, that the net proceeds of the individual estate of each partner shall be applied to the payment of his personal debts, and only the surplus remaining can be applied to partnership debts, and, on the other hand, the net proceeds of partnership property shall be applied first to partnership debts and only the surplus to the individual debts of the partners. See In re Henderson (D. C.) 142 Fed. 588; Euclid Nat. Bk. v. Union Deposit Co., 149 Fed. 975, 79 C. C. A. 485. In this case, it may be a novel application of these principles governing partnerships between individuals to this union between these corporations, yet, I have not been able to see why they should not under general principles of equity be in effect made applicable. At the date of the union both corporations were indebted, large indebtedness was incurred by the two companies so united, for which, as I have herein set forth, in my judgment, both were liable. The New Jersey-West Virginia company is now in bankruptcy. It is true that when the union was to be dissolved by agreements of April-May, 1907, it was provided that the debts owing by the West Virginia company should be paid out of its "quick" assets by Peet, but at least one of these debts as set up in the petition of the Citizens' Trust & Guaranty Company of West Virginia, alleged to be represented by judgment and execution lien, has not been paid, and perhaps others exist. Touching this judgment of the Citizens' Trust & Guaranty Company of West Virginia, it is true its validity is denied by plaintiff in his answer to this company's petition and, that while ab-

stracts from the lien docket and copies of the execution and the levy are filed, no copy of the judgment itself, which alone can verify its existence, is filed. This is so clearly an oversight that it will be in the interest of justice allowed to be corrected, for the debt in the evidence filed in the main cause is recognized and admitted. Its existence was admitted in the re-exchange agreements.

It seems to me under all the circumstances that the plaintiff Carton, trustee, is entitled to relief, and that this relief shall in effect be (a) the holding of the agreements of April-May, 1907, void as to creditors of the New Jersey-West Virginia company now existing, incurred while the two companies were joined; (b) to the holding that the execution of the $50,000 bonds and of the deed of trust to secure the same was null and void as to creditors of the West Virginia company itself and as to creditors of the New Jersey-West Virginia company, whose debts were incurred while the companies were joined; (c) to having the debts of the West Virginia company itself ascertained and also an ascertainment of the debts of the New Jersey-West Virginia company, incurred while the two companies were joined; and (d) to having a sale made of the property of the West Virginia company, and out of the proceeds arising therefrom, payment, first, of the costs of this suit and of the expenses of sale, second, of the costs of the receivership, including the certificates hereinbefore authorized, third, of the debts of the West Virginia company itself, and, fourth, of the application of surplus to debts of the New Jersey-West Virginia company, incurred while the two companies were united.

If counsel can agree as to the several items of these debts and payments to be made, decree of sale can at once be entered, otherwise reference to a master will be necessary.