[No. 15540. Department Two. April 7, 1920.]

JACOB LUMPP, *Respondent,* v. D. K. McDONALD *et al.,*
*Defendants,* D. M. DRUMHELLER, *Appellant.*[1]

CONSPIRACY (7)—FRAUD (23)—EVIDENCE—SUFFICIENCY. The evidence fails to show that defendant, in purchasing stock in a corporation, participated in a confederation and conspiracy on the part of the promoters to defraud other subscribers, where it appears he had no part in or knowledge of the preliminaries, he was approached and his subscription solicited in the same manner as other subscribers, he was not informed of the inflated prices, and made his subscription as a matter of business and to honestly aid a friend; and it is immaterial that he obtained stock at a reduced price.

CORPORATIONS (99)—STOCK SUBSCRIPTIONS—PERSONS ENTITLED TO SUE. While an insolvent corporation or its receiver may enforce a stock subscription which was not paid in full, a stockholder who has paid in full cannot recover from the delinquent the sums lost by investment in the stock.

Appeal from a judgment of the superior court for Spokane county, Blake, J., entered February 17, 1919, upon the verdict of a jury rendered in favor of the plaintiff, in an action for damages for conspiracy to defraud. Reversed.

*Edwin C. Matthias* and *Graves, Kizer & Graves,* for appellant.

*F. W. Girand* and *Fred M. Williams,* for respondent.

FULLERTON, J.—In the early part of the year 1913, the defendant D. K. McDonald, then and for a long time prior thereto a resident of the city of Spokane, in this state, contracted to purchase two certain tracts of land, situated in the state of California, near Palo Alto, the combined area of the tracts aggregating approximately 1,379 acres. The contract price agreed to be paid for the land was $392,500, of which sum

[1]Reported in 188 Pac. 913.

McDonald paid $10,000. The contract was taken in the name of the defendant D. A. McKinnon, and McDonald subsequently entered into a contract with McKinnon by the terms of which he purported to purchase the land of McKinnon for the sum of $517,500. McDonald's purpose in purchasing the land was to place certain improvements upon it, subdivide it into smaller tracts, and make a profit by selling the tracts at prices enhanced over the original cost. McDonald had conducted a number of similar enterprises near the city of Spokane which had been successful, and in the conduct of which he had added to his theretofore good reputation for business ability, integrity, and fair dealing. After entering into the contracts, McDonald returned to Spokane and conceived the idea of organizing a corporation to finance the enterprise. To that end, he caused to be prepared a stock subscription agreement in the following form:

"Whereas, it is proposed to organize under the laws of Washington a corporation to bear such name as may hereafter be designated by the parties interested therein, the object of such corporation being to own and hold for development and sale the following described real estate situated in Santa Clara county, California, to wit: A tract of land containing $1,379 acres, a little more or less, being part of the land formerly owned by the Seale Estate, and a part of the land known as the Clarke estate, said land adjoining the town of Palo Alto, Santa Clara county, California, with power to do all things which may seem calculated directly or indirectly to promote the business interests of said Company, and

"Whereas, it is proposed that said corporation shall have capital stock of $350,000, to be divided into 3,500 shares the par value of $100 per share—$140,000 of the proceeds of the sale of said stock or as much of it as is deemed necessary to be used for development purposes, $210,000 to be applied on the purchase price of the above land and assume deferred payments

amounting to $307,500 due on or before three years at six per cent interest, making the purchase price $517,500, and

"Whereas, the undersigned parties each desire to become holders of stock in said corporation,

"Now Therefore, we the undersigned in consideration of our mutual promises do severally agree to and with each other and with D. K. McDonald who is actively interested in the formation of said corporation to take the number of shares of stock in said corporation set opposite our respective names as signed hereto and to pay therefor the sum of $100 per share, said shares to be issued to us upon the formation of said corporation.

"Dated at Spokane, Washington, March 29th, 1913."

After preparing the agreement, the defendant signed his own name thereto as subscribing for five hundred shares, that of the defendant McKinnon as subscribing for one hundred and ten shares, and that of one John Twohy as subscribing for two hundred and fifty shares. He then sought subscriptions from the residents of the city of Spokane and vicinity. Among those approached for a subscription, was the appellant Drumheller. He was approached by McDonald personally. After several interviews, Drumheller told McDonald that, if he could be let in on a par with the promoters of the enterprise—"on the ground floor"— he would subscribe for a block of the stock. McDonald then offered him a price of $40 per share, which he accepted, putting his name on the subscription agreement as subscribing for two hundred and fifty shares. The agreement was then further circulated and other subscribers obtained, among whom was the respondent, Jacob Lumpp, who subscribed for twenty shares. After the list had reached a face value of $280,000, a corporation was formed with a capital stock of that sum, and its shares issued to the subscribers of the subscription agreement. The corporation took over

the contract of purchase and entered upon the business of improving, subdividing, and selling the land. The enterprise proved a failure, and the stockholders of the corporation lost the money they had invested in it.

In this action, the respondent sues in damages to recover the sum lost by him. In the complaint, he charges that the defendants confederated and conspired together to cheat and defraud the members of the public generally and himself in particular out of such sums of money as they or he could be induced to invest in the capital stock of the corporation. He named as defendants, D. K. McDonald, D. A. McKinnon, George E. Snyder, the appellant Drumheller, and a number of others. One of the persons not named was not served with process, and the others were dismissed from the action, either before or after the commencement of the trial. Of the defendants named, McDonald, McKinnon and Snyder answered, but did not defend at the trial, further than that McDonald appeared in court and was called as a witness. Drumheller answered separately and alone defended. The trial resulted in a verdict and judgment against all of the defendants named, and Drumheller alone appeals.

The appellant's main contention is that the evidence does not sustain the verdict and judgment rendered against him. With this contention, we agree. A careful study of the evidence convinces us that, if there was a confederation and conspiracy on the part of the promoters of the enterprise to cheat and defraud the subscribers to the capital stock of the corporation, Drumheller was a victim of the conspiracy, not a participant therein. While he invested less proportionally in the shares of stock than did some of the other subscribers, he, like they, lost all he did invest and received nothing by way of gain. The scheme of pur-

chasing the land, improving, subdividing and selling it through the instrumentality of a corporation, was wholly McDonald's. In the preliminary work, he was aided and assisted by McKinnon and Snyder; and McKinnon was, of course, a necessary party to the plan by which the purchase price of the land was made to appear greater than it really was.

But there is no evidence that Drumheller in any way participated in these transactions, or that he knew of them, or even knew of the enterprise until after the preliminary work had been consummated. His first knowledge of the transaction was acquired after the contracts of purchase were entered into, after the subscription agreement had been prepared, and after it was put in circulation. He was approached as all other subscribers were approached; he was shown the subscription agreement, an explanation of the plans and purposes was made to him, and such questions as he asked concerning them were answered. The agreement was brought to him by McMonald in person. The testimony of McDonald, as well as his own, shows that he was not informed of the inflated price, or that certain of the names then on the list were not genuine, and much less was he asked to join in a conspiracy by which other subscribers could be defrauded. Mr. Drumheller was then close to his eightieth year. He had lived an honorable, upright, and busy life. He had accumulated a competence, and was well and favorably known in the community in which he had lived. Doubtless McDonald desired his subscription for the influence it would have on others whom he intended to approach. But this was not made known to Drumheller, and his own testimony is that he had no thought that this was any part of McDonald's purpose; and we think he might well be excused for failing to suspect it. McDonald himself was a man of

good reputation. Drumheller had known him favorably for many years. He knew, also, that the promotion and conduction of enterprises of this sort was McDonald's business, and knew that he had promoted and conducted similar enterprises honorably and successfully. The natural and necessary inference from this is that he made his subscription as a matter of business, or in a desire to honestly aid a friend, rather than for the purpose of aiding him in the commission of a fraud. But whatever may be the reasons which caused him to subscribe, it is manifest that he joined in no conspiracy to cheat and defraud any one, much less the respondent.

Can he be held to make good the respondent's loss because of his agreement with McDonald that he was to pay for the stock a price less than the price stated in the subscription agreement? We think it clear that he cannot be so held. It may be that, as between himself and McDonald, the contract was a valid one; that is to say, it is possible that, had he been compelled by the corporation or its representative to pay a greater price for the stock than it was agreed between himself and McDonald that he should pay, he could have recovered over against McDonald for the excess of price. But as between himself and the corporation, or between himself and the other subscribers to the agreement, it was an invalid contract. His promise, insofar as they were concerned, was absolute and could have been enforced in the same manner as subscriptions generally to such enterprises are enforced—that is, at the suit of the corporation on its own behalf, or at the suit of a representative of the corporation on behalf of the other stockholders who had paid in full—but it gave the respondent no right of action against him to recover his individual loss.

Counsel have filed extensive briefs, and their arguments have taken a wide range, but we see no necessity of prolonging the discussion. Our conclusion is that evidence of a conspiracy in which the appellant had a part is wholly lacking, and that the agreement by which he was to obtain his shares at less than their face value was not a fraud upon either the corporation or the respondent, and does not entitle the respondent to recover from the appellants the sums invested by him in the corporation's capital stock.

The judgment is reversed as to the defendant Drumheller, and the cause remanded with instructions to enter a judgment to the effect that the plaintiff take nothing against him by this action.

HOLCOMB, C. J., BRIDGES, TOLMAN, and MOUNT, JJ., concur.