# Wytheville

## GRACE SECURITIES CORPORATION v. JUDITH SELDEN ROBERTS.

June 16, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*John A. Cutchins*, for the plaintiff in error.

*John S. Davenport, III, William G. Talley* and *Robert H. Talley*, for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

This is an action to recover $2,655.00 for a breach of contract to repurchase stock sold the defendant in error by the plaintiff in error. The case was submitted, on stipulation of counsel, to the trial judge without a jury, and judgment was rendered for the defendant in error.

The parties will be designated plaintiff and defendant, as they appeared in the trial court. The facts are brief and may be stated thus:

On September 21, 1927, at the office of the defendant, the Grace Securities Corporation, in the city of Richmond, the plaintiff was induced by Mr. Oscar E. Parrish, at that time its senior executive and active vice-president, to buy sixty shares of stock in the corporation at $44.25 per share, with the written assurance that the corporation would repurchase the same at any time she desired to sell.

At that time the stock of the defendant corporation was offered on the Richmond market at $46.50 and bid $44.00 per share. Dividends were duly paid on the stock during the years 1927, 1928 and for the first six months of 1929. Some time during that year and after the October dividend was passed, the offering price of the stock was $15.00, and

bid $8.00, per share. On December 2nd, the plaintiff demanded that the defendant repurchase the sixty shares in accordance with its promise. The demand was refused, and this action followed.

The defendant contends: (1) That the act of Parrish in making this agreement to repurchase the stock was *ultra vires;* (2) that the words, "at any time," contained in the promise meant a reasonable time, and that a reasonable time in which to repurchase the stock had expired before the plaintiff requested the defendant to comply with its written offer.

The defendant, both in stating the first assignment of error and in its argument thereon, failed to make the distinction between an act which is *ultra vires i. e.*, an act of a corporation which is not within the power conferred by its charter or the general law—and an act of an officer or agent which is within the charter powers but not authorized by the corporation.

The first question to be determined is whether or not the contract, if within the charter powers of the corporation, was executed under such circumstances as to make it the act of the corporation.

The plaintiff knew that the defendant held out to the public Parrish as its active chief executive officer, and that it maintained an office for him. Parrish made the agreement in the name of the corporation and for its benefit. The plaintiff paid her money to the investment department of the corporation, and was given a receipt therefor with the contract written thereon, a duplicate copy of which was retained by the department, with a notation thereon to send check for dividend October 1st. While it is stated that neither the board of directors nor the executive committee ever passed a formal resolution directing Parrish to make the contract with the plaintiff, there is no denial of the fact that the members of the board had full knowledge

of the conditions under which the plaintiff paid her money to the corporation. With this knowledge the corporation will not be permitted to repudiate the act of Parrish on the ground that his act was not authorized by it. Fletcher Cyc. Corp., section 1965, where it is said: "If officers of a corporation exceed their powers, their acts may be repudiated by the board of directors. However, if directors desire to repudiate a sale by executive officers, they should act promptly, notify the other party to the contract, and return benefits received."

In *Winston* v. *Gordon*, 115 Va. 899, at page 907, 80 S. E. 756, 760, Keith, P., in discussing a similar question, cites the following authorities:

"In *Kelsey* v. *National Bank*, 69 Pa. St. 426, it is said: 'The law is well settled that a principal who neglects promptly to disavow an act of his agent, by which the latter has transcended his authority, makes the act his own; and the maxim which makes ratification equivalent to a precedent authority is as much predicable of ratification by a corporation as it is of ratification by any other principal, and it is equally to be presumed from the absence of dissent.'

"And in 2 Kent's Com. 616, the law is thus stated: 'It is a very clear and salutary rule in relation to agencies that where the principal, with knowledge of all the facts, adopts or acquiesces in the acts done under an assumed agency, he cannot be heard afterwards to impeach them under pretense that they were done without authority, or even contrary to authority.'

\*     \*     \*     \*     \*     \*     \*     \*     \*

"In *Sherman* v. *Fitch*, 98 Mass. at page 64, the court said, speaking of the authority of an agent to execute a mortgage on behalf of a corporation: 'It is not necessary that the authority should be given by a formal vote. Such an act by the president and general manager of the business

of the corporation, with the knowledge and concurrence of the directors, or with their subsequent and long continued acquiescence, may properly be regarded as the act of the corporation. Authority in the agent of a corporation may be inferred from the conduct of its officers, or from their knowledge and neglect to make objection, as well as in the case of individuals.'

"In *Fort Worth Publishing Co.* v. *Hitson et al.*, 80 Tex. 216, 14 S. W. 843, 16 S. W. 551, * * * the court said: 'We can see no good reason why a corporation may not be bound by acts of acquiescence in a transaction which may be irregular on its face if not prohibited, or which may be in excess of the officer's power acting for the corporation.' "

See also *Holstein-Harvey-Kirk Co.* v. *H. Kirk & Sons*, 150 Va. 82, 142 S. E. 373.

■ When the contract was made with the defendant, plaintiff was not informed whether the defendant was acting for itself or as agent for an undisclosed principal. It is now claimed in defendant's brief that the stock was owned by a pool composed of its directors, and not by the corporation itself. The only proof in the record on this subject is as follows: (1) Letter from Oscar E. Parrish to Robert H. Talley, dated May 6, 1930; (2) stipulation of counsel containing an agreed statement of facts; (3) the pool contract of December, 1926.[1]

---

[1]AGREEMENT

"This agreement made this ——— day of December, 1926, by and between the undersigned

"WITNESSETH: First—The undersigned hereby agree to form a syndicate for the purchase of shares of the United States Bond and Mortgage Corporation and Grace Securities Corporation Common Stock in the open market at a figure of forty-five dollars ($45.00) or less per share for the Grace Securities Corporation stock, and forty dollars ($40.00) or less for the United States Bond and Mortgage Corporation Common Stock.

"Second—Each of the undersigned agrees to purchase and pay for when and as demanded his proportionate shares of such stock as may be purchased hereunder.

"Third—The maximum amount of stock to be purchased hereunder shall be as many times one hundred shares as there are signers of this agreement, and the actual number of shares to be purchased within this limits and the

The pertinent paragraph of the letter of May 6, 1930, is as follows: "As the corporation at that time, through pool operation composed of members of the board of directors, was buying and selling its stock, I recommended that she purchase this stock with the understanding that the corporation would redeem it, if necessary, at the purchase price."

The following is the statement contained in the stipulation of council: "It is, however, denied by officers of Grace Securities Corporation that the corporation was buying and selling its stock through pool operations. A pool was formed by certain individual stockholders as per the attached copy of an agreement entered into in December, 1929, and marked 'Exhibit C' as a part of this stipulation.

"It is further denied by officers of the corporation that 'sales had been made through the officers of institutions with these agreements,' or that any action of the board or executive committee was ever taken authorizing such agreements."

Parrish states that the corporation, through the pool, was buying and selling its stock. The stipulation denies that the corporation was buying and selling its stock, but does not affirm that the pool owned this stock, or whether

price to be paid therefor is to be determined by the Manager of the Investment Department of the Grace Securities Corporation by and with the advice of Messrs. Ross H. Walker and William R. Trigg, Jr.

"Fourth—This syndicate is to be started immediately, and each of us agrees to become bound thereunder, as soon as ten or more signatures are obtained hereto.

"Fifth—Any party hereto may withdraw from the said syndicate at any time upon giving two weeks notice in writing of his intentions so to do to the Manager of the Investment Department of the Grace Securities Corporation, which said notice, it is hereby agreed, shall be considered as notice to each of the undersigned in which case the proportionate shares of stock held in the syndicate shall be paid for by the said withdrawing member. The said stock so withdrawn shall not be offered for sale for a period of four months from the date of withdrawal.

"Sixth—This syndicate is to be dissolved when, in the opinion of the majority of the signers hereof, the object to be accomplished has been satisfactorily accomplished.

"Seventh—It is agreed that the purchase of stock on the market shall

or not it bought and sold any stock. There is no proof that any part of the plaintiff's money was ever paid to the pool. The corporation acknowledged that it received her money and gave her a receipt therefor, with the distinct understanding that the money would be returned by the defendant on her making demand upon it. Parrish confused the action of the board of directors in managing corporate affairs with the action of the board when and if it was operating as a pool. If these matters were distinct, they were within the peculiar knowledge of the defendant, and inasmuch as it did not avail itself of the opportunity to clarify the sale, we will regard the ownership of the stock in question as in the defendant corporation.

Having disposed of these preliminary questions, we now turn to the question raised by the first assignment of error, viz: Did the corporation have the power to make the contract to repurchase its stock?

There are current two inconsistent doctrines on the subject. One is that it is inherently illegal, in the absence of statutory authority, for a corporation to purchase its own stock. The other is, that a corporation may buy its own stock, if the interest of creditors be not adversely affected, and if its power to buy be not restricted by its charter or by the general law. Both doctrines are fully discussed in the following cases and in the annotations

be made by or through the Investment Department of the Grace Securities Corporation, which said Corporation shall receive the usual commission therefor; and we further agree to settle for such purchase when required by said Corporation.

"Eighth—Each member of the syndicate agrees to pay into the hands of the Manager of the Investment Department of the Grace Securities Corporation the sum of $500.00 to be used as a revolving fund for purchase of the syndicate.

"Ninth—The agent is to have power to call for additional payment from members after consultation with the members of the syndicate.

"Tenth—The signers of this agreement further agree with one another and with the Manager of the Investment Department of the Grace Securities Corporation that they will not either directly or indirectly deal, buy, or sell any share of stock of the Grace Securities Corporation or the United States Bond and Mortgage Corporation during the continuance of this agreement, without conferring with the syndicate managers."

thereto in the L. R. A. series: *C. R. Fitzpatrick* v. *C. E. McGregor, Receiver, etc.,* 133 Ga. 332, 65 S. E. 859, 25 L. R. A. (N. S.) 50; *Atlanta & Walworth Butter & Cheese Asso.* v. *Smith,* 141 Wis. 377, 123 N. W. 106, 32 L. R. A. (N. S.) 137, 135 Am. St. Rep. 42; *Schulte* v. *Boulevard Gardens Land Co.,* 164 Cal. 464, 129 Pac. 582, 44 L. R. A. (N. S.) 156, Ann. Cas. 1914B, 1013; *Lefker* v. *Rachel Harner,* 123 Ark. 575, 186 S. W. 75, L. R. A. 1916F, 281; *Kelly* v. *Central Union Fire Ins. Co.,* 101 Kan. 91, 165 Pac. 806, L. R. A. 1918C, 1170; see also 6 Fletcher Cyc. Corp. (Perm. Ed.), sections 2845, 2878.

The following authorities hold that under certain conditions such a contract will be enforced in this State:

In *U. S. Min. Co.* v. *Camden & Driscoll,* 106 Va. 663, 56 S. E. 561, 117 Am. St. Rep. 1028, the corporation sold twenty-five shares of its capital stock at $100.00 per share, upon an agreement to repurchase on demand, if made within four months from the date of sale. The original purchasers exercised their option within the specified time, but the corporation declined to repurchase. Thereupon action was instituted. The corporation claimed that the contract was *ultra vires,* and therefore void. This court, in disposing of that contention, said: "In the absence of charter or statutory prohibition, it is well settled, indeed the prevailing doctrine in the United States, that corporations may purchase, hold and sell shares of their own stock, provided they act in good faith and without intent to injure their creditors. *Rivanna Nav. Co.* v. *Dawsons,* 3 Gratt. (44 Va.) 19, 46 Am. Dec. 183; *Shoemaker* v. *Washburn L. Co.,* 97 Wis. 585, 73 N. W. 333; *Republic L. Ins. Co.* v. *Swigert, Auditor,* 135 Ill. 150, 25 N. E. 680, 12 L. R. A. 328; *Rollins* v. *Shaver Wagon Co.,* 80 Ia. 380, 45 N. W. 1037, 20 Am. St. Rep. 427; *Dock* v. *Schlichter Jute [Cordage] Co.,* 167 Pa. St. 370, 31 Atl. 656; *Blalock* v. *[Kernersville] Mfg. Co.,* 110 N. C. 99, 14 S. E. 501."

See, also, *Duncan* v. *Carson*, 127 Va. 306, 103 S. E. 665, 105 S. E. 62; *Kennerly* v. *Columbia Chemical Corporation*, 137 Va. 240, 119 S. E. 265.

We deem it useless to enter into a discussion of the various circumstances under which courts have enforced or refused to enforce such a contract.

The defendant here, in the stipulation of its counsel, states: "Neither the corporation's charter, nor the general law, contains a provision forbidding it to purchase or deal in its own or any other stock or make agreements relative thereto;" and in its brief asserts that "the right is vested in the corporation to sell, buy and otherwise deal in its own stock."

We then have the defendant admitting that there is no provision in its charter or the general law forbidding it to make the contract, and positively asserting that the corporation had such power. How then can it consistently urge that this contract of the corporation is *ultra vires?* We are confined in this as in all other cases to the record as made in the trial court.

In addition to the above, the record consists of (1) a declaration in assumpsit containing the usual counts and a special count setting up the contract; (2) a plea of *non est factum* filed by the defendant; and (3) the stipulation of facts agreed on by counsel for the respective parties. As we have pointed out above, the defendant made the contract with the plaintiff, and hence its plea of *non est factum* failed. The defendant did not see fit to introduce in evidence its charter, nor is it proven that the defendant owes any debts, or that it had the right to issue and did issue more than one class of stock, or show that any stockholder would be affected by the enforcement of the contract with plaintiff other than to state that the market value of the stock had depreciated. These were affirmative defenses and unless proven we cannot consider them.

■ If the contract of repurchase is valid, the plaintiff has under it a right to deliver her stock to the defendant and receive from it the price agreed upon. The same result follows if the contract to repurchase is invalid. If we concede that the contract is *ultra vires* (and for the purposes of this case and for the sake of the argument we are willing to concede this), it is void and might as well have never been written, for the net result of the transaction is that the defendant has the plaintiff's money, has given no consideration therefor and holds it illegally.

■ In 4 Fletcher's Cyc. Corp. (Perm. Ed.), section 1538, in discussing an agreement in a subscription to repurchase or take back its stock, it is said: "According to the weight of authority, an agreement by which a purchaser may, at his option, at the end of a certain time, return the stock and receive back the price, or whereby the company agrees to repurchase it at an agreed price after a certain time, is in the nature of a conditional sale with an option to the purchaser to rescind, and is valid, provided there is a sufficient consideration which supports it, and there is no fraudulent invasion of the rights of creditors or of the other stockholders. A reason sometimes given for sustaining such agreements is that the contract is entire and indivisible, and that the sale cannot be sustained unless the contract to repurchase can be enforced; nor can the corporation be heard to say that the latter provision is *ultra vires* without rescinding the sale and returning the purchase money." See also *Id.*, section 2849.

As we have already indicated, the record does not disclose that there has been any invasion of the rights of creditors or stockholders in this case.

The agreement to repurchase would have been a perfectly worthless warranty if it could have been exercised only on a rising market, and no one could have expected this purchaser to avail herself of it under such conditions.

It was an inducement to her to purchase, and held out to her as an inducement. She availed herself of it when loss was threatened, as she might naturally have been expected to do, and only in this event was it of any value at all to her.

In *Richmond, Fredericksburg & Potomac R. Co.* v. *Richmond, etc., Connection Co.*, 145 Va. 266, at page 303, 133 S. E. 888, 899, it was said: "Ordinarily, according to former rules of procedure in a case of this kind, the proper remedy would be for the aggrieved party, the Connection Company here, to disavow the contract and sue to recover as on a *quantum meruit*. Under the more liberal rules of pleading, especially in the case of action in assumpsit, to which this action by notice corresponds, where an action is founded upon a contract which is shown to be void, but where the contract has been executed and a defendant has enjoyed valuable rights thereunder, a recovery upon *quantum meruit* under the general issue should be permitted upon the original action without requiring the institution of entirely new proceedings, if the pleadings are sufficiently broad and the proof is sufficient."

Applying this principle to the case at bar, and on the assumption that the contract is *ultra vires*, the plaintiff is entitled to recover under the common count of money had and received, as charged in the declaration filed.

The only other assignment of error which merits consideration is, that the contract required the plaintiff to exercise her option within a reasonable time, and that a reasonable time had expired when she requested the defendant to repurchase.

The expression "at any time," used in the contract, really means a reasonable time. What is a reasonable time in which to exercise an option based on valuable consideration depends upon the facts and circumstances of each particular case. There are only three facts shown

by the record which throw any light on the subject, *i. e.*, (1) that the plaintiff refused to buy until the promise to repurchase was made; (2) the language of the promise itself; (3) that about the time the plaintiff elected to exercise her option to sell the market value of the stock had depreciated.

The plaintiff was not willing to make the investment and assume the risk of a decline in the selling price of the stock. She knew nothing of how the corporate property was managed or of the possible profits from its various undertakings. She knew that these were all matters within the peculiar knowledge of the defendant, and that with this knowledge it agreed to assume this risk. The selling price of the stock declined within two years. The plaintiff thereupon exercised the right given her by demanding that the defendant perform its obligation. The defendant is now seeking to escape this obligation on the ground that the plaintiff failed to act in time. Nothing was said or done at the time of the sale, or prior to the time the plaintiff made her demand, which would indicate that either party intended for the option to be exercised promptly. The defendant, at the time it made the promise, did not see fit to require the plaintiff to exercise the right given her within any stated time. Simply because the stock declined in price within two years is not sufficient for us to hold, as a matter of law, that a reasonable time has expired.

This conclusion is supported by authorities from other jurisdictions.

In *Vickrey* v. *Maier*, 164 Cal. 384, 129 Pac. 273, 274, the option was to repurchase the stock "at any time after six months." Demand was made for repurchase after the lapse of nearly four years. Under the circumstances of that case, the court held that the demand was made within a reasonable time.

In *Kaplan* v. *Reid Bros.*, 104 Cal. App. 268, 285 Pac. 868, 869, the language of the contract to repurchase was, "the company agrees that it will at any time, on thirty days notice, return you the par value of this stock, plus any accrued dividends." This promise was made on January 24, 1921, and on February 10, 1927, the purchaser demanded that the corporation carry out its agreement to repurchase the stock. The court in disposing of that case said: "The use of the words 'at any time' in the contract before us indicated an intention of the parties that the option given respondent was not one as to which there was any necessity or occasion for promptness in its exercise, but quite the contrary."

Upon the payment of the judgment, the defendant is entitled to have the stock certificates returned to it. Probably through oversight, no provision was made for this in the order entered by the trial court. It appears that the plaintiff has been, and is, ready, willing and able to surrender the stock certificates upon the payment of the amount due. The order of the trial court might have been, and doubtless would have been, so corrected if timely application had been made to it.

To this extent the judgment of the trial court is amended, and so amended is affirmed.

*Amended and affirmed.*

EPES, J., dissenting.

This case was tried by the court without the intervention of a jury upon a stipulation of the evidence.

On September 21, 1927, Mrs. Roberts called on Oscar E. Parrish, the executive and acting vice-president of Grace Securities Corporation, at the office of this corporation. While she was in his office Parrish suggested to her that she purchase sixty shares of the common stock of Grace Securities Corporation at $2,655.00 ($44.25 per share). At

first she refused; but Parrish assured her that, if she would purchase this block of stock, Grace Securities Corporation would repurchase it at this figure at any time the registered owner desired to sell it. Upon receiving this assurance she agreed to purchase the sixty shares of this stock at this price, paid the purchase price, $2,655.00, and received a bill of sale therefor signed by "Grace Securities Corporation, Per........," upon which was written: "We agree to repurchase this block of stock for $2,655.00 at any time the registered owner desires to sell same." A stamped endorsement on the face of the bill of sale showing payment of the purchase price is signed: "Investment Dept. Grace Securities Corp."

There is nothing about this bill of sale to suggest that this transaction was a subscription by Mrs. Roberts to the stock of Grace Securities Corporation. It is a common form of bill of sale appropriate for use in making sale of securities which are either owned by the seller or being sold by it for the account of a client; and it bears no notation showing whether these sixty shares of stock were owned by Grace Securities Corporation or by a client. The reasonable inference from the whole record, however, is that this stock belonged to the parties to the pool agreement below mentioned, and was being sold for this account. A duplicate original of the bill of sale was retained by the corporation.

With reference to this transaction Parrish's testimony, as stipulated in the record, has this to say:

"As the corporation at that time through pool operations, composed of members of the Board of Directors, was buying and selling its stock, I recommended that she purchase this stock with the understanding that the corporation would redeem it, if necessary, at the purchase price."

It is stipulated, however, that the testimony of the

officers of Grace Securities Corporation is that the corporation was not buying and selling its stock through pool operations; but that the pool operations were being carried on by certain individual stockholders under the pool agreement filed in evidence.

This pool agreement shows that it was entered into by certain named persons (who, Parrish says, were directors of the corporation), for the purchase and sale of the common stock of the Grace Securities Corporation with capital contributed by them, and for their own private gain; and that the only connection the corporation had with the pool was to act as its purchasing and selling agent for a commission upon the several transactions.

There was no provision in the certificate of incorporation of Grace Securities Corporation either forbidding or authorizing it to purchase or deal in its own stock, or to make agreements relative to the repurchase thereof.

It is also stipulated that there is no provision in the statutes of Virginia which forbids it to purchase or deal in its own stock or to make agreements relative thereto; but, as I shall hereafter show, this is only qualifiedly true.

It is further stipulated that no "action of the board (of directors of the corporation) or the executive committee (thereof) was ever taken authorizing such agreements" as that made with Mrs. Roberts; and that "there was no express by-law or resolution of the corporation conferring specific authority upon Mr. Parrish to make an agreement of the character in issue here."

In addition to this, there is nothing in the stipulation of the evidence even tending to show that the stockholders, common or preferred, of the corporation had ever expressly or impliedly authorized or assented that the corporation should engage in the purchase of its stock or make an agreement such as that in question here; or that they, or any of them, had either expressly or impliedly ratified the

agreement here in question, or knew of it until after demand was made upon the corporation by Mrs. Roberts that it repurchase this block of stock; or indeed that the stockholders generally have ever been informed of the existence of this agreement.

The inference from the testimony of Parrish is that this was the only contract of this nature made by him for the corporation; and the record does not show that any other contract of this nature was ever made by the corporation.

On September 21, 1927, when the agreement here in question was made, the common stock of Grace Securities Corporation was quoted on the Richmond Stock Exchange at $46.50 per share asked and $44.00 bid. On October 1, 1929, the corporation for the first time passed its dividend on its common stock.

On December 2, 1929, nearly two years and three months after she purchased this stock, Mrs. Roberts made demand upon the corporation that it comply with its agreement to repurchase it from her at $44.25 per share, the price paid by her.

During 1927, 1928 and the first nine months of 1929, the whole world was enthralled by an unprecedented boom in the values of practically all stocks and bonds and of many commodities. But in October, 1929, there occurred a crash in the market values of practically all stocks, bonds and commodities of so great proportions that it was in effect a world cataclysm, which has continued and grown worse up to the present time. All this is a matter of such common knowledge that, I think, a court may and should take cognizance of it in a case of this nature.

At the time the demand that the corporation repurchase this stock the market value thereof had fallen so greatly that it was being quoted on the Richmond Stock Exchange at $15.00 asked, $8.00 bid.

While the stipulation of the evidence contains no express

statement that Grace Securities Corporation had issued preferred stock, from the particularity with which the stock purchased by Mrs. Roberts and that being dealt in under the pool agreement is designated as being common stock, it is a fair inference, I think, that the corporation had issued preferred stock as well as common stock.

When Mrs. Roberts demanded that the corporation repurchase the stock held by her the corporation refused to repurchase it on three grounds: (1) That the agreement was the unauthorized act of Parrish; (2) that the agreement was an *ultra vires* act and therefore unenforceable against the corporation; and (3) that the words "any time" meant within a reasonable time, and under the circumstances the demand that the corporation repurchase the stock had not been made within a reasonable time.

I think that all three grounds were well taken; and that the court erred in not entering final judgment for Grace Securities Corporation.

The third ground upon which the corporation refused to repurchase this stock I shall not discuss at any length.

The court in its opinion holds that "any time," as used in the agreement here sued upon, means within a reasonable time. With this I agree. But it further holds that demand that the corporation repurchase this stock was made within a reasonable time. With this conclusion I am unable to agree. The trial court based its holding on this point upon the precedent of *Kaplan* v. *Reid Bros.*, 104 Cal. App. 268, 285 Pac. 868. This court supports its conclusion on this point by citing *Vickrey* v. *Maier*, 164 Cal. 384, 129 Pac. 273. These two cases are among the most extreme cases on this subject to which my attention has been called. The reasoning in them is far from convincing, and they appear to me to be out of line with the better considered cases on this subject. In the *Kaplan Case* the court takes refuge in the statement that it is unable to

say that the judgment of the trial court that the demand was made within a reasonable time was without evidence to support it. In the *Vickrey Case* the brief quotation from the contract is wholly insufficient to disclose the true nature of the contract under consideration, and for a clear comprehension of what was held by the court in that case reference should be had to the report of the case. It is sufficient here to note that the court found words in the contract which indicated much more strongly than the words "at any time" that an indefinite delay in making demand for repurchase was contemplated by the parties; and besides the contract was between two natural persons.

But, however this may be, in neither of these cases had the plaintiff held the stock for over two years of what was commonly and currently recognized as one of the greatest boom periods in the history of the world, and waited to make demand that the corporation repurchase until there had been such a material change for the worse in the general financial condition of this country and the world as to amount to a world cataclysm. Under such circumstances, two years and three months is (I think) *prima facie* an unreasonable time to wait before demanding a repurchase under such a contract; and there is no evidence in the record which offers any reason for this long delay in demanding a repurchase of this stock, other than that Mrs. Roberts felt that she could continue indefinitely to play a game of heads I win, tails you lose. The only inference that can reasonably be drawn from the record is that Mrs. Roberts had decided to hold this stock so long as the stock continued to pay dividends and did not decrease greatly in market value. When she reached this state of mind, I think, she had exercised any election she may have had to demand a repurchase thereof.

The first and second grounds upon which the corporation based its refusal to purchase this stock are so closely connected that I shall consider them together.

I do not agree with the point of view that the two questions now under consideration are to be determined upon the assumption that the State is not concerned with them as a matter of public policy. In view of the wide extent to which investments are now being made by the general public in corporate stocks and bonds, it seems to me that the State is vitally concerned with them as a matter of public policy. See in this connection section 167 Const. of Va.; sections 3788, 3780b, 3850, 3792, 3781, 3714, 4465, 4465a, and the so-called blue sky laws, Acts 1928, page 1374, ch. 529, section 3848 (47) *et seq.* References are to Michie's Va. Code, 1930.

My examination leads me to the conclusion that there are three lines of cases on the question. When, if at all, a contract made by a corporation for the purchase of its own stock will be upheld or enforced? (1) The conservative, (2) the liberal, and (3) the extreme. As might be expected, there are border line cases in each of these classes. The cases which fall in the class I denominate extreme have, I think, little of reason to support them, unless the supposed hardship of the immediate case be a reason. The decision of the court in this case seems to me to follow the extreme class of cases on this subject.

In England and in some of the States, in the absence of statutory or charter authority or inhibition to make such a contract, the general rule is that contracts made by a corporation for the purchase of shares of its own stock are *ultra vires,* and will not be upheld or enforced; but to the general rule there are some few exceptions. There is much sound reasoning to support the courts which adhere to this rule; and disclosures, to which a court should not shut its eyes, are being made almost daily in official and unofficial investigations, which afford strong reasons for the adherence to this rule as a matter of public policy.

In the majority of the States, however, the general rule

is more liberal; and the rule to be deduced from the better considered cases falling within the class I have designated as the "liberal" class seems to me to be this:

In the absence of statutory or charter authority or inhibition, a contract by a corporation to purchase its own stock will be upheld or enforced against the corporation provided: (1) That it is made in good faith without *intent* to injure creditors or stockholders who have not expressly or impliedly given their assent to or ratified the making of the contract; *and* provided (2) that at the time of performance compliance with the contract did not, or its enforcement will not, *in fact*, injure creditors or non-assenting stockholders.[1]

This is a general rule to which, however, some courts have made some exceptions upon more or less sound principles.

Non-assenting stockholders are within the rule as well as creditors, though there are perhaps fewer exceptions in the case of creditors than stockholders. As said by this court, speaking through Riely, J., in *Augsburg Land &*

---

[1] In a number of cases language is used to the effect that such contracts are not void and are enforceable if made in good faith without *intent* to injure creditors. Such a statement is made in *U. S. Mining Co.* v. *Camden & Driscoll*, 106 Va. 663, at page 665, 56 S. E. 561, 117 Am. St. Rep. 1028, but an analysis of the case will, I think, demonstrate that the rule is not so broad.

That a contract by a corporation to purchase its own stock will not be enforced if at the time of performance its enforcement *would* injure creditors of the corporation, see, *Hoover Steel Ball Co.* v. *Schafer Ball Bearings Co.*, 90 N. J. Eq. 164, 106 Atl. 471; *McIntyre* v. *E. Bement's Sons*, 146 Mich. 74, 109 N. W. 45, 10 Ann. Cas. 143; *Roan* v. *Winn*, 93 Mo. 503, 4 S. W. 736; *Hunter* v. *Garanflo*, 246 Mo. 131, 151 S. W. 741; *Olmstead* v. *Vance & Jones Co.*, 196 Ill. 236, 63 N. E. 634; *Coleman* v. *Tepel* (C. C. A.) 230 Fed. 63; *Re O'Gara & McGuire* (D. C.) 259 Fed. 935; *Re Brueck & Wilson Co.* (D. C.) 258 Fed. 69; *Grasselli, etc., Co.* v. *Aetna, etc., Co.* (D. C.) 258 Fed. 66; *Re Fechheimer-Fishel Co.* (C. C. A.) 212 Fed. 357; *Keith* v. *Kilmer* (C. C. A.) 261 Fed. 733, 9 A. L. R. 1287; *Carton* v. *West Va., etc., Co.* (C. C.) 183 Fed. 1009; *Hamor* v. *Taylor, etc., Co.* (C. C.) 84 Fed. 392. In so far as *Kennery* v. *Columbia Chem. Corp.*, 137 Va. 240, 119 S. E. 265, may be said to hold to the contrary, it is in conflict with the great weight of authority.

That the same rule is on reason and principle applicable to non-assenting stockholders who are injured thereby, see *Price* v. *Pine Mt., etc., Co.*, 17 Ky. L. Rep. 865, 32 S. W. 267; *Sarbach* v. *Kansas, etc., Co.*, 86 Kan. 734, 122 P. 113, Ann. Cas. 1913C, 415, 418.

*Improvement Co.* v. *Pepper*, 95 Va. 92, at page 97, 27 S. E. 807, 808: "The directors can make no disposition of the corporate property which shall not inure to the equal benefit of all the stockholders. Such an act would be not merely *ultra vires*, but a fraud upon the other stockholders." See, also, *Wolf* v. *Excelsior Automatic, etc., Co.*, 270 Pa. 547, 113 Atl. 569; *Boley* v. *Sonoro Development Co.*, 126 Mo. App. 116, 103 S. W. 975, 976; *Sarbach* v. *Kansas Fiscal Agency Co.*, 86 Kan. 734, 122 Pac. 113, Ann. Cas. 1913C, 415. Even in California, where the courts seem to have gone to as great an extreme as in any State in enforcing contracts of the nature here under consideration, the rule above stated has to some extent received recognition. *Newark Trust Co.* v. *Kriebel*, 49 Cal. App. 614, 193 Pac. 962.

Under this rule, where a contract for the repurchase of stock is not under the rule, or some exception thereto, permissible and enforceable, neither the officers nor the directors have any power or authority, express or implied, to make such a contract; and the ratification by the directors of such a contract will not make it enforceable. The consent to or ratification thereof by the stockholders and creditors, where affected, is necessary to render it enforceable.

The basic reason for refusing to uphold or enforce a contract made by a corporation for the purchase of its own stock is the protection of the creditors and other stockholders of the corporation. Where these reasons for not upholding or enforcing the contract are absent, as a general rule, the contract will be upheld or enforced. The cases falling within this general category account for a very large number, probably a majority, of the cases which are commonly cited in support of the proposition that contracts by a corporation for the purchase of its stock are not *ultra vires*.

Contracts to purchase the stock of a stockholder made

by a solvent corporation with the express or implied authority or assent of the other stockholders, or expressly or impliedly ratified by them, fall within this class of cases.

So when a corporation purchases its stock with its surplus assets for prompt delivery at its then fair market value, the transaction will generally be upheld or enforced because, generally speaking, such a transaction does not prejudice the rights of either creditors or stockholders. If any prejudice results, it usually results from the subsequent holding of the stock by the corporation.

For the same reason, where the purchase of its stock is made in good faith to save the corporation a loss upon a debt due it, the courts generally will uphold the transaction.

For similar reasons courts will often uphold, as against non-assenting stockholders, and sometimes against creditors, the cancellation of a stock subscription where there is reasonable ground for belief that the subscriber is unable to meet his obligation to pay for the stock for which he has subscribed.

So also when a corporation has issued and sold more stock than it is authorized to issue, it may repurchase sufficient of its stock to correct the wrong it has done. *Kelly* v. *Central Union F. Ins. Co.*, 101 Kan. 91, 165 Pac. 806, L. R. A. 1918C, 1170.

The contracts referred to in the preceeding five paragraphs are rather contracts which are permissible under the principles or the rule above announced, than contracts enforceable as exceptions to the rule; but there are certain exceptions to the rule which some courts have made upon more or less sound principles. The great weight of authority, however, limits these exceptions to cases in which the rights of creditors are not injuriously affected, and in many of the cases there would seem to have been facts which made the contract permissible under the rule above

stated. In making reference to some of the exceptions which have been made by courts here and there, I shall merely state them. The instant case falls within none of the exceptions, and it is unnecessary here to discuss the soundness of them.

The most numerous class of exceptions seems to be composed of cases in which the agreement to purchase or repurchase the stock of a stockholder is an integral and appropriate part of a contract made to effectuate some of the purposes of the corporation, and is merely incidental to the main purpose of the contract.

Falling within this general class of exceptions are cases in which the corporation, as a condition of employment, requires its employee to purchase and hold a certain amount of its stock, and agrees to repurchase it if his services are dispensed with by the corporation, or requires the employee to sell his stock to the corporation if he voluntarily leaves its employment. The purchase by a corporation in good faith of its stock to settle or remove differences or conflicts in the management of the affairs of the corporation may also sometimes fall within this general class of exceptions.[2]

Another subclass under this general class of exceptions is composed of cases involving a contract the main purpose of which was the purchase of property, real or personal, which was necessary or proper for the purposes of the corporation at a fixed price to be paid either in whole or

---

[2] *Copper Belle Min. Co.* v. *Costello*, 11 Ariz. 334, 95 Pac. 94; *San Antonio, etc., Co.* v. *Sanger* (Tex. Civ. App.) 151 S. W. 1104; *Yeaton* v. *Eagle Oil & Refining Co.*, 4 Wash. 183, 29 Pac. 1051; *Williams* v. *Maryland Glass Corp.*, 134 Md. 320, 106 Atl. 755; *Lane* v. *Barnard*, 185 App. Div. 754, 173 N. Y. S. 714; *Strodl* v. *Farrish-Stafford Co.*, 145 App. Div. 406, 130 N. Y. S. 35; *Strait* v. *Northwestern, etc., Works*, 148 Wis. 254, 134 N. W. 387; *Richards* v. *Ernst Wiener Co.*, 207 N. Y. 59, 100 N. E. 592; *Security Savings Bank* v. *Workman*, 188 Iowa 576, 176 N. W. 307; *Revloc Supply Co.* v. *Troxell*, 281 Pa. 424, 126 Atl. 774; *Fleitmann* v. *John M. Stone Cotton Mills*, 186 Fed. 466, 108 C. C. A. 444, writ of certiorari denied 223 U. S. 723, 32 S. Ct. 524, 56 L. Ed. 631; *Hesse Envelope Co.* v. *Addison* (Tex. Civ. App.) 166 S. W. 898.

in part by stock at a fixed price per share, but which contained the further provision that, if within a specified time the vendor desired it, the corporation would take back the stock and pay him in money. *U. S. Mining Co. v. Camden & Driscoll*, 106 Va. 663, 56 S. E. 561, 117 Am. St. Rep. 1028, would seem to fall within this subclass of exceptions.[3]

There is another line of cases which seem to make an exception to the rule where the contract or the circumstances surrounding the making of the contract show that the real purpose of the contract was to procure a loan of money for the corporation. In some of the cases falling within this class of exceptions such reason as there is to sustain the exception has been stretched well nigh to the vanishing point. It is somewhat difficult to determine the exact principle upon which the court rests its decision in *Kennerly* v. *Columbia Chem. Corp.*, 137 Va. 240, 119 S. E. 265; but the court seems to have regarded the agreement there under consideration as in some sense an agreement for a loan with the stock of the corporation put up with the lender as security therefor.

In *Furrer* v. *Nebraska, etc., Co.*, 111 Neb. 67, 195 N. W. 928,[4] and some other similar cases, the court does not

[3] See, also, in this connection, *Morgan* v. *Lewis*, 46 Ohio St. 1, 17 N. E. 558; *Butler* v. *Beach*, 82 Conn. 417, 74 Atl. 748; *Rowan* v. *Texas Orchard Devel. Co.* (Tex. Civ. App.) 181 S. W. 871.

[4] In *Furrer* v. *Nebraska, etc., Co.*, 111 Neb. 67, 195 N. W. 928, the facts were these: In February, 1920, the corporation sold to Furrer eighty-five shares of the preferred stock of the corporation at $112.00 with this collateral agreement: "The party of the second part is to have the privilege of withdrawing this money from party of the first part on March 1, 1921, on the basis of the present investment, or whatever may be added to it in the way of accumulations, if any. In the event he does not ask for this money, or withdraw it on March 1, 1921, then he agrees to leave it one more year, and the same contract will apply on the same basis for withdrawal on March 1, 1922. After that, it shall be a matter with party of the second part as to how much additional time he may want to leave it."

When Furrer demanded that the corporation take back his stock and return to him $112.00 per share therefor, the condition of the corporation was such that in a liquidation the other preferred stockholders of the same class would receive only from $25.00 to $30.00. The court enforced the contract though it was expressly stipulated that no stockholder, other than the officers and directors, had any knowledge of the transaction.

place its decision upon the ground that the transaction was in reality a loan of money rather than a sale of stock, but it seems to me that in this case and others similar to it there is more reason for enforcing the agreement to repurchase the stock on that ground than on the grounds upon which the courts place their decisions.

There is still another class of cases which may, perhaps, be classified as constituting exceptions to the rule above stated by me as the "liberal" rule. These are cases in which the corporation has sold its stock under an agreement that it will do some specific thing (as for instance, construct a plant in a given locality within a given time), and that if it fails to do so will repurchase the stock sold on the faith of such agreement.[5] However, in most of these cases the real basis for enforcing the agreement to repurchase was that for some reason the case did not fall within the rule, or to prevent the perpetration of a fraud, often fraud *in case contractu.*

There is a small class of cases which hold a contract for the purchase of stock enforceable, notwithstanding the fact that the very purpose and necessary effect thereof was to give that stock involved a preference over the other stock of the corporation, common and preferred, and that the actual effect of the performance of the agreement would be to give that stock a material and substantial preference over all other stock issued by the corporation.

Such cases are, I think, unsound on reason and principle, and it is my understanding that the majority of the justices participating in this decision do not intend to go so far as to approve this line of cases; but, in my judgment, the result of their decision in this case has that effect.

It may well be that a corporation may purchase shares of its own stock at their then market value without the

---

[5] See, in this connection, *Bovee* v. *Boyle,* 25 Colo. App. 165, 136 Pac. 467; *Hall* v. *Hardaker,* 61 Fla. 267, 55 So. 977; *Chicago, etc., R. R. Co.* v. *Marseilles,* 84 Ill. 643.

corporation intending to give, or in effect giving, these shares of stock a preference over stock of the corporation held by other stockholders, and without the seller intending to secure, or in fact securing, a preference for his stock. There may also be cases in which an agreement to repurchase at some future date shares of its stock held by a stockholder may be so incidental to the main purpose of the contract that, as a matter of public policy, an exception to the general rule should be made, and the agreement to repurchase should be upheld even when there are non-assenting stockholders, as for instance, in some of the cases cited in note 2 *ante.*

But when a corporation makes an agreement with one who is about to purchase its stock, that it will, at the option of the stockholder or his transferee, within a specified or "at any time" in the future, repurchase from him such stock at a fixed price, which has no relation to the actual or market value of the stock at the time the agreement is to be performed, this constitutes the creation of this stock a preferred stock taking priority over all its other stock, common and preferred.

The very purpose and intention of both the corporation and of the stockholder in making such a contract is to make the stock held by the stockholder a preferred stock. It is the sole purpose of the agreement. The fact that the purchaser required that this be done before he would purchase the stock, or only purchased it because this inducement was held out to him does not, and cannot, change the fact that it was his intention to have this stock given a preference over all other stockholders of the corporation, common and preferred.

Section 3792[6] of the Code, as amended by Acts 1926, page 18, c. 8, which was in effect at the time the contract here under consideration was made, read as follows:

---

[6] Section 3792 was amended by Acts 1928, page 1158, c. 456, section 2, in particulars material to the question here under consideration.

"Every corporation shall have power to create two or more kinds of stock, of such classes, with such designations, preferences, and voting powers, or restrictions or qualifications thereof, as shall be stated and expressed in the charter, certificate of incorporation, or articles of association, or in any amendment thereof; and the power to increase or decrease the stock, as elsewhere provided, shall apply to all or any of the classes of stock. Any or all classes of preferred stock may, if desired, be made subject to redemption at such time or times and at such price, not less than par, as may be expressed in the certificate of incorporation or any amendment thereof; and the holders of such preferred stock shall be entitled to receive and the corporation bound to pay thereon dividends at such rates and on such conditions as shall be stated in its charter or any amendment thereof, or in the original or amended certificate of incorporation, or articles of association, or in an amendment thereof; and such dividends may be made payable before any dividends shall be set apart or paid on the common stock, and such dividends may be made cumulative."

Section 3850, Code Va. 1919, relating to what the certificate of incorporation shall set forth, which was in effect when the contract here in question was made, read in part as follows:

"Such certificate of incorporation shall set forth:   *   *   *

"(d)   The maximum and minimum amount of capital stock of the corporation, and its division into shares; and if there be more than one class of stock created by the certificate of incorporation, a description of the different classes thereof, with the terms on which such different classes are created."

No cognizance of section 3792 and section 3850 (or section 3788 or section 3781) seems to have been taken by the court in its opinion in *U. S. Mining Co.* v. *Camden &*

*Driscoll,* 106 Va. 663, 665, 56 S. E. 561, 117 Am. St. Rep. 1028; *Duncan* v. *Carson,* 127 Va. 306, 103 S. E. 665, 105 S. E. 62; and *Kennerly* v. *Columbia Chem. Corp.,* 137 Va. 240, 119 S. E. 265; and in its opinion in the instant case the court wholly ignores them.

As noted by the court in its opinion, the parties do stipulate that the general law contains no provisions "forbidding it to purchase or deal in its own stock * * * or make agreements with reference thereto;" and the plaintiff in error asserts in its brief that it has the right "to sell, buy and otherwise deal in its stocks." But I have never understood that the parties could by their stipulation or statement change the law. Nor do I think that the inference may fairly be drawn from this that there is no general law placing limitations or restrictions upon its right to deal in its stock or make agreements with reference thereto. It is further true, as stated in the opinion of the court, that this court is "confined in this as in all other cases to the record as made in the trial court." But if it is intended that it shall be implied from this statement that, in considering the issue raised both here and below that this contract is unenforceable because illegal, this court is bound by a stipulation of the parties or statement of counsel as to what the law is, I cannot concur in it. I think the statute law of Virginia on this subject may not be thus put aside and disposed of. But these statutes having been thus disposed of by an estoppel based apparently upon the doctrine of invited error or of failure to assign as error that the contract violated the provisions thereof, it would appear that the effect of these sections upon the validity of such contracts is left open; and that this case must be interpreted and construed as having been decided upon the assumption that they were nonexistent.

Sections 3792 and 3850, I think, provide by necessary

implication that a corporation shall not issue or create stock having any preferences over any other stock issued by the corporation except as provided for in its certificate of incorporation, or some amendment thereof.

They are not mere statutory grants of the right to corporations to provide in their certificates of incorporation that they may issue preferred stock. They are also statutes enacted for the protection of the members of the public who may become stockholders of the corporation. In view of these statutory provisions, the members of the public who have purchased the stock of a corporation have the right to rely upon the fact that, if the certificate of incorporation does not authorize the giving of a particular preference to an individual stockholder, or class of stockholders, no stock will be issued or created which has such a preference over their stock, or act done which will in effect give such a preference to a stockholder without the assent, express or implied, of the stockholders.

Not only may the members of the public who have become stockholders rely upon this, but every one who contracts with the corporation with reference to its stock is, I think, charged with knowledge of this inhibition. Public policy demands that this be true. If it is not, the door is thrown wide open to the officers or directors of corporations and individual investors dealing with them to play fast and loose with the great mass of people who are today investing in corporate stocks, common and preferred. The contrary rule may take care of a few cases of real or apparent hardship, but it exposes millions of stockholders to unreasonable hardships against which they have no way of protecting themselves, and often to actual fraud which they have no way of proving.

In the instant case the corporate officers who sold this stock to Mrs. Roberts intended to give her a preference; and she purchased it because she understood this stock

was being given a preference over the other stock, common and preferred, of the corporation. The record shows that if the contract is enforced it will injure the other stockholders, certainly the other common stockholders of the corporation. The fact that she will receive $44.25 per share for stock the market value of which is from $8.00 to $15.00, at most, is sufficient proof that the performance of the contract will injure the other stockholders, in the absence of any evidence to the contrary.

It may be true that the loss to each individual stockholder from the performance of this particular agreement will be so small as to be insignificant; but the principle involved is the same whether the amount of stock involved is sixty shares or 6000 shares.

An agreement such as that here in issue, when authorized, assented to, or ratified by the stockholders, may be enforced even though *ultra vires*, if it does not in fact injure creditors, because the reason for refusing to enforce it has been removed. The authority or assent of the stockholders may be expressed or implied; and a course of dealing may be proven which will estop the stockholders, or the corporation for them, from asserting that they have not given their assent to the making of such a contract. But until such authority, assent, ratification or course of dealing has been proven, it cannot, I think, be said upon sound reasoning that because the officers of a corporation have been empowered to manage and conduct its affairs generally (or to sell, issue and transfer the stock of the corporation), they have the apparent or implied authority to sell, or by contract create, preferred stock of a class for which there is no provision made in the certificate of incorporation.[7] This is true where the stock sold is stock

---

[7] It seems to be universally held that promoters of a corporation have no authority to bind the corporation by a contract to repurchase stock subscribed for or sold for the account of the corporation. *Reiff* v. *Nebraska-California Colony Co.* (U. S. C. C. A. Neb.) 277 Fed. 417; *Boushall* v. *Stronach*,

belonging to the corporation. It is even more true where the stock being sold belongs to a group of the directors who have formed a pool to trade in the stock for their own private gain. *Calteaux* v. *Mueller*, 102 Wis. 525, 78 N. W. 1082; *Murray* v. *Standard Pecan Co.*, 309 Ill. 226, 140 N. E. 834, 31 A. L. R. 604. See, also, *Nuncz Gin & Warehouse Co.* v. *Moore*, 10 Ga. App. 350, 73 S. E. 432; *Wheeler* v. *Northwestern Sleigh Co.* (C. C.) 39 Fed. 347; 1 Cook on Corp. (8 ed.) section 168. See contra *Kaplan* v. *Reid Bros.*, 104 Cal. App. 268, 285 Pac. 868.

What is said in *A. I. M. Percolating Corp.* v. *Ferrodine Chem. Corp.*, 139 Va. 366, 124 S. E. 442, and *Richmond Guano Co.* v. *E. I. Dupont, etc., Co.* (C. C. A.) 284 Fed. 803, has no application to a case such as this. These cases deal with the apparent authority of the officers and agents of a corporation to act in the ordinary business affairs of a corporation. The extraordinary power to make contracts for the repurchase of a corporation's own stock or to make contracts creating preferred stock not provided for in its certificate of incorporation, if such power exists, may not properly be said to be included in the apparent authority of its officers and agents.

In *Calteaux* v. *Mueller*, 102 Wis. 525, 78 N. W. 1082, 1083, the court says: "It would seem that a discussion of the subject presented and citation of authorities is unnecessary to show that a mere business manager of a corporate organization does not, by virtue of his office, ordinarily possess any such extraordinary authority as that of buying in its capital stock. The power of the corporation to do that is doubted in some jurisdictions and denied in others. No court that concedes it goes so far as to hold that the power can be exercised by an officer

172 N. C. 273, 90 S. E. 198; *Lumpp* v. *Drumheller*, 110 Wash. 692, 188 Pac. 913; *Magnuson* v. *Drumheller*, 110 Wash. 701, 188 Pac. 915; *Drucklieb* v. *Sam H. Harris*, 209 N. Y. 211, 102 N. E. 599; *Huster* v. *Newkirk Creamery & Ice Co.*, 42 Okla. 440, 141 Pac. 790, L. R. A. 1915A, 390; *Eichelberger* v. *Mann*, 115 Va. 774, 80 S. E. 595.

of the corporation having no special authorization by the governing body so to do. There are many things which a corporation may do, of much less importance than that of buying its capital stock, which cannot be done by a business manager without special authority, express or implied. * * * He may enter into such contracts and do such acts as pertain to the regular course of corporate business under his direction, and no more. When he goes outside of that without special authority, express or implied, his acts will not be binding upon the corporation." The court also adds: "That" (the purchase of its capital stock) "was no part of the general business of the corporation, nor incident to such general business in any way."

*Murray* v. *Standard Pecan Co.*, 309 Ill. 226, 140 N. E. 834, 836, 31 A. L. R. 604, was a case in which an agent of the Standard Pecan Company, authorized to sell its stock, had made a sale of its stock at $10.00 per share, under a written contract that the corporation would repurchase it, if so required to do, at the expiration of three years at $11.00 per share. The court, in holding the contract unenforceable, says: "Where, as in this case, the only authority of the agent is to unconditionally sell stock, collect and account to his principal for the proceeds of the sale, and without his principal's knowledge the agent agrees that his principal will repurchase the stock, the principal is not bound by the unauthorized agreement of the agent. So far as the principal is concerned the sale is not conditional, and retaining the money for the stock under such circumstances is not a ratification of the agent's unauthorized agreement."

In 1 Cook on Corp., 8 ed., section 168, it is said:

"A subscription contract, like any other contract, may be waived, cancelled or dissolved by the mutual consent of all the parties interested. The interested parties are the subscriber himself, the other stockholders and the

corporate creditors existing at the time of the cancellation. Frequently the directors of the corporation attempt to usurp this right and power of the general stockholders. The well-established rule, however, is that the corporate directors have no power to agree with a subscriber that his subscription shall be cancelled, unless such power is given by charter or statute or the by-laws of the corporation. The cancellation of a subscription differs little from a purchase by the corporation of shares of its own stock."

If it be true, as I think it is, that contracts for the purchase of stock such as that here in question are prohibited and made illegal by law for the protection of the stockholders, the directors of the corporation have neither power to make such a contract, or to ratify and affirm such a contract, nor are the stockholders estopped to object thereto by anything the directors do without their knowledge, assent or ratification. Therefore, in the view which I take of this case, as there is no evidence tending to show that the stockholders for whose protection the contract here in question was prohibited had any knowledge thereof, or have assented thereto or in any way ratified it, or have failed to disavow it promptly after it had come to their knowledge (if it ever has come to their knowledge), the quotations made by the court from Fletcher Cyc. Corp. 1965; *Winston v. Gordon,* 115 Va. 899, 80 S. E. 756; *Kelsey* v. *National Bank,* 69 Pa. 426; 2 Kent's Com. 616; *Sherman* v. *Fitch,* 98 Mass. 59; *Fort Worth Pub. Co.* v. *Hitson & Reed,* 80 Tex. 216, 14 S. W. 843, 16 S. W. 551, and *Holstein-Harvey-Kirk Co.* v. *H. Kirk & Sons,* 150 Va. 82, 142 S. E. 373, are not in point.

The principle applied in *Richmond, Fredericksburg & Potomac R. Co.* v. *Richmond F. & P. and R. & P. Railroad Connection Co.,* 145 Va. 266, 133 S. E. 888, can have no application to a case in which to permit one party to an illegal contract to disavow the contract and sue upon a

*quantum meruit* would effectually enable that party to accomplish the very object for the prevention of which the contract has been made illegal. The law is not given to furnishing means for defeating its own ends. If this contract is prohibited by law for the protection of the stockholders against the creation of secret preference in favor of one or more stockholders, the law cannot be circumvented by suing upon a *quantum meruit,* for to permit a recovery thereon would be to enforce the prohibited preference as effectually as by an action on the contract.

The court in its opinion cites four Virginia cases as having settled in this State the questions here under consideration. *Rivanna Nav. Co.* v. *Dawsons,* 3 Gratt. (44 Va.) 19, 46 Am. Dec. 183; *U. S. Min. Co.* v. *Camden & Driscoll,* 106 Va. 663, 56 S. E. 561, 117 Am. St. Rep. 1028; *Duncan* v. *Carson,* 127 Va. 306, 103 S. E. 665, 105 S. E. 62; *Kennerly* v. *Columbia Chem. Corp.,* 137 Va. 240, 119 S. E. 265. These cases are all distinguishable from the case at bar; and though there is some language used in these opinions which tends to support the decision of the court in the instant case, what was decided in those cases is, I think, far from requiring the decision reached by the court in this case.

All that is held in *Rivanna Nav. Co.* v. *Dawsons* is that a corporation may take, hold and resell shares of its capital stock devised or otherwise given to it.

In none of the three last named cases is any cognizance taken or mention made of sections 3850, 3792, 3788 and 3781, Code Virginia, or section 167 of the Constitution of Virginia.

The corporation involved in *U. S. Min. Co.* v. *Camden & Driscoll* was a Maine corporation and the Maine statutes on this subject are not put in evidence. However, if it is to be presumed that the Maine statutes at that time were the same as the Virginia statutes on this subject, then it is to be noted that the agreement there involved was made

in March, 1903, before the passage of the act concerning corporations (Acts 1902-3-4 [Ex. Sess.] page 437, c. 270, *et seq.*) from which sections 3850, 3792 and the other sections above mentioned were taken. Further, as has been said, this last case falls within one of the exceptions to the rule which has received more or less recognition from other courts; and in addition to this, an examination of the record in this case discloses that there were other facts and circumstances which made it a much stronger case for the enforcement of the agreement to repurchase than is the instant case.

*Duncan* v. *Carson* was not a suit or action brought against a corporation to enforce its agreement to purchase its own stock; but was a case which was decided upon a demurrer to the evidence interposed by Carson. It was an action brought by Carson against Duncan to enforce payment of three notes aggregating $5,000.00, dated September 5, 1917, drawn by Duncan payable to his own order six months after date, and by him endorsed in blank. The defense made by Duncan was that the notes were unenforceable because he was induced to execute them by the fraud of Marion Allen and Pope Seals to whom they were delivered. The fraud relied upon was this. Marion Allen was the "fiscal agent" and "general sales manager" and Pope Seals was the stock salesman of Carson Manufacturing Corporation. Allen and Seals pursuaded Duncan to subscribe for 250 shares of the stock of the corporation at $5,000.00. As an inducement to him to make this subscription they told him that the corporation would agree to take his note, or notes, for $5,000.00 payable twelve months after date in payment of the stock, and agree to repurchase this stock from him for $5,625.00 within eleven months from September 5, 1917. They filled out the three notes, however, making them payable six, instead of twelve, months from date. Duncan could not read without his glasses, and they

professed to read the notes to him; but read the notes as being drawn payable twelve months after date. Relying upon the fact that they had read the notes as written, Duncan signed them; and they delivered to him this agreement:

"We hereby agree and bind ourselves to pay E. R. Duncan $5,625.00 in cash for 250 shares of capital stock of Carson Mfg. Corp., within eleven (11) months from date, if he so desires.

"MARION ALLEN,
"Genl. Mgr. of Sales
"POPE SEALS."

The subscription contract, which showed a subscription for cash and made no reference to the repurchase agreement, was delivered to the corporation; and the 250 shares were issued by the corporation to Duncan. But as Allen and Seals had no authority to sell stock except for cash, and had to turn in the purchase money for this stock, they sold the note to Carson, who was president of the Carson Manufacturing Corporation, and paid the cash into the treasury of the corporation.

The court in its opinion does use some language which rather indicates that had these notes been accepted by the corporation Duncan would have "had the right to set up the defense growing out of the repurchasing agreement," but its decision is not based upon this point. What the court held was that there was evidence to support a finding that the notes were procured from Duncan by fraud, and that Carson had not borne the burden of showing that he was an innocent holder for value and without notice of their imperfection; and that on a demurrer to the evidence the court must so hold. Demand had been made by Duncan upon the corporation to repurchase this stock within the eleven months' period; but it refused to do so. In affirming

the judgment, overruling the demurrer to the evidence and dismissing the action against Duncan, this court set aside the verdict of the jury in favor of Duncan for $362.50, and required him to deliver the 250 shares of stock to Carson without the payment of any sum by him to Duncan, though the repurchase agreement was for the repurchase at $5,625.00 and the notes were for only $5,000.00. This shows that the view taken by the court was that the whole transaction was void, or at least voidable, *ab initio* for fraud.

As has been noted, in so far as *Kennerly* v. *Columbia Chem. Corp.* may be construed to hold that an agreement by a corporation to repurchase in the future shares of its capital stock is enforceable when the corporation is insolvent at the time performance is demanded, it is opposed to the great weight of authority even in those States which are liberal in the enforcement of such contracts; and would seem to require for the support of the decision that the agreement be treated as in some sense an agreement for a loan. It is rather difficult to ascertain the specific basis upon which the court rests its decision in this case, but the following statements of facts are made in the opinion (italics mine):

"When organized the corporation had no tangible assets except a formula which it expected to use in the manufacture of syrups and soft drinks similar to Coca-Cola.

"W. O. Trenor, acting for himself and also as agent for the Columbia Chemical Corporation, solicited the complainants to purchase stock in the corporation. Complainants informed him that they had no means with which to purchase stock except the farm of 177.84 acres and that in no event would they take over $5,000.00 worth of stock. It was finally agreed between Trenor, complainants and the corporation that $15,000.00 worth of stock be issued to complainants by the corporation, $5,000.00 of which was to be purchased in fee by complainants. The remaining

$10,000.00 worth was to be held by the complainants for twelve months; and at the expiration of that time this $10,000.00 worth of stock was, upon thirty days' notice, to be taken back by the corporation at the price of $10,000.00 cash, with six per cent interest. This agreement between complainants and the corporation was reduced to writing on September 12, 1917, and in accordance with the agreement of the parties complainants deeded the 177.84 acres of land, and certain growing crops, machinery, etc., to W. O. Trenor and H. M. Trenor, his wife, for the $15,000.00 worth of stock. *The conveyance was made to them to expedite the sale and transfer of the property.* Trenor and wife soon sold the farm for $15,000.00 cash, most of which was turned over to the corporation, as a loan or otherwise, *and used by it* in exploiting its enterprise and promoting the sale of its stock.

"The complainants complied with the terms of the agreement on their part, and gave the required notice demanding that the corporation comply on its part by redeeming the $10,000.00 worth of stock at the end of twelve months. *Upon the request of the corporation,* a further extension of twelve months' time in which to redeem the $10,000.00 worth of stock was granted the corporation. At the expiration of the final extension period complainants demanded that the corporation comply with the terms of its agreement, which it refused to do, assigning no reason for noncompliance except lack of money.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"The contract and agreement of September 12, 1917, was executed by the corporation in its corporate name by its president and attested by its secretary. The execution and delivery of this paper was a condition precedent to the delivery by complainants of the deed for the farm to Trenor and wife.

"The by-laws of the corporation provided that five

members of the board of directors should constitute a quorum for the transaction of business. The business of the corporation was conducted principally by five directors, two of whom were officers. They frequently transacted business for the company without entering any resolution or minute on the directors' record book, and the record book fails to show any action on the part of the board with reference to the contract of September 12, 1917.

*"The corporation was greatly in need of money in September, 1917, and entered into the agreement in question with the understanding* that the greater portion of the money derived from the sale of the personalty and the farm should be paid over to the corporation as a loan or otherwise and this was done. *Later, a resolution was adopted by the stockholders ratifying all acts done by the board of directors."*

The record in this case is not available to me, and I am unable to ascertain just what is the import of the italicized words. But it is evident that the court was to some extent basing its decision on facts tending to show that there had been a ratification of the agreement by the stockholders, and was also treating the agreement in some sense as an agreement for a loan.

In conclusion, the rule hereinbefore stated as the "liberal" rule, subject to some of the sounder exceptions thereto which have been recognized by the courts, seems to me to be as liberal a rule as can be justified on legal principles or a sound public policy, or adopted without violating section 3850 and section 3792 of the Code, and opening a broad avenue for the evasion of the sound underlying principles of section 167 of the Constitution and section 3788 and section 3781 of the Code. To go further than this and hold such a contract enforceable unless it was made for the purpose of and with the *intent* to injure either the creditors or the stockholders of the corporation, provides unconscionable officers and directors with a means, the

effectiveness of which is assured by law, to use secretly their offices and the resources of the corporation to give fictitious values to the stock of the corporation in support of their private speculations therein to the deception of the public and the injury of their stockholders. It permits the wary investor to procure a secret guarantee at the expense of the other stockholders against loss by the purchase of stock, and in some instances prevents a hardship upon an unwary investor; but it subjects the stockholders, both common and preferred, in all corporations to a peril against which they are practically without means of protecting themselves and without reason to suspect.

I think the judgment of the trial court should be reversed and final judgment entered for the plaintiff in error.